UNITED STATES of America

v.

Lawrence Daniel CALDWELL, A/K/A
Thomas E. Morgan, Appellant
(two cases).

UNITED STATES of America

v.

Eros A. TIMM, Appellant (two cases).

Nos. 72–1513 to 72–1516.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 18, 1973.

Decided Dec. 31, 1974.

As amended Jan. 2, 1975.

Rehearing and Rehearing En Banc
Denied Sept. 23, 1976.

Harry David Rosenbloom and John T. Shinkle, Washington, D.C. (both appointed by this Court), for appellant in Nos. 72–1513 and 72–1515.

Carol Garfiel Freeman, Washington, D.C., with whom Michael A. Fayad, Washington, D.C. (both appointed by this Court), was on the brief for appellant in Nos. 72–1514 and 72–1516.

Earl J. Silbert, Principal Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the briefs were filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellants have been found guilty by a jury on numerous charges emanating from two armed robberies in the District of Columbia and the slaying of a police officer as the aftermath of one. On the verdicts, the trial judge entered judgments convicting appellants and sentencing them to long terms of imprisonment.[1] Appellants now tender for our consideration a veritable host of contentions,[2] all of which we have studied assiduously. Finding, in the circumstances of the case, no need for definitive decision of some issues, and no error warranting reversal on the others, we affirm the judgments in part and vacate them in part,[3] leaving unaffected the maximum term of imprisonment imposed.

## I. THE FACTUAL BACKGROUND

We start with a summary of the events comprising the offenses with which appellants were charged and the major developments at the trial ensuing. Our recitation is not nearly exhaustive of the innumerable details,[4] nor need it be at this point. Appellants do not dispute the commission or the ingredients of the crimes, or their roles as perpetrators; their points on appeal, rather, are objections to procedural aspects of the trial, and the facts bearing on each are staked out fully as they are successively treated in subsequent sections of this opinion. Our present effort, then, is simply to recount highlights in order to frame the backdrop against which the legal issues posed can more perceptively be analyzed and resolved.

### A. *The Offenses*

The two holdups from which the charges in suit emanated took place on May 24 and 25, 1971. On the first date, at about 11:00 a. m., appellants entered a branch office of the American Savings and Loan Association at 4900 Massachusetts Avenue, N.W.[5] Dressed in business suits and sporting short, conservative haircuts, the two men first

1. The convictions, and the sentences respectively imposed, were as follows:

 On counts 1, 7 and 11, for federal bank robbery, 18 U.S.C. § 2113 (1970) five to fifteen years' imprisonment (both appellants).

 On counts 2, 8 and 12, for armed robbery, D.C.Code §§ 22–2901, 22–3202 (1973), five to fifteen years' imprisonment (both appellants).

 On counts 4, 10 and 14, for assault with a dangerous weapon, D.C.Code § 22–502 (1973), two to eight years' imprisonment (both appellants).

 On counts 5 and 18, for carrying an unlicensed pistol, D.C.Code § 22–3204 (1973), one year's imprisonment (appellant Timm).

 On count 6, for felony-murder, D.C.Code § 22–2401 (1973), life imprisonment (both appellants).

 On counts 15 and 16, for federal firearms violation, 26 U.S.C. §§ 5861(d), (i), 5871 (1970), two to eight years' imprisonment (both appellants).

 On count 17, for carrying an unlicensed pistol, D.C.Code § 22–3204 (1973), one year's imprisonment (appellant Caldwell).

 All sentences were designated for concurrent operations except those on counts 7 and 11, which are to be served consecutively to the sentence imposed on count 1.

2. In Part I, we discuss, the factual background of the robberies and the trial itself. Part II summarizes our holdings with respect to pretrial publicity and the conduct of the voir dire. In Part III, we analyze the issues concerning the pretrial competency determination of Caldwell. Part IV is an extensive discussion of issues affecting the presentation of the insanity defenses. In Part V, we address problems relating to severance of the codefendants. Encompassed in Part VI are our views on the conduct of the prosecutor's summation. Finally, in Part VII we explore the various claims of error as to the final instructions to the jury. There also we capsulize our dispositions of the convictions.

3. The precise disposition, by counts of the consolidated indictment, is set forth in Part VII at notes 191–195, *infra.*

4. The parties' statements of the facts of the case without repetition or undue elaboration, consume a total of 187 pages of their briefs.

5. The prosecution and the defense stipulated that this institution is a corporation and that its accounts were insured by the Federal Savings and Loan Insurance Corporation. See 18 U.S.C. § 2113(g) (1970). A similar stipulation was made as to National Permanent Federal Savings and Loan Association, the other institution robbed.

conferred briefly.[6] Caldwell then approached teller Betty Vance and asked about opening an account; simultaneously, Timm proceeded to the window of another teller, Gwenda Younger. After a customer in front of Timm completed her transaction, he placed a briefcase on the counter with a note saying, "place your money in this briefcase." Perceiving a dark automatic pistol pointed at her, Ms. Younger reached for bait money, but was foiled when Timm recognized what she was about to do and warned her not to touch the bait money or the alarm. After emptying her own money drawer, she obeyed his order to obtain additional cash from another teller. A total of $4,305 was taken.

Both men fled from the building on foot. Officer Nelson Gosnell, already staking out a nearby bank, observed them as they crossed an adjacent parking lot to an intersection, at which point they separated and casually walked away in different directions. In a matter of minutes, Officer Gosnell responded to the report of the holdup of American Savings, but by that time appellants had escaped and no one was able to track their movements.[7]

On the next morning, May 25, again about 11:00 a. m., the second holdup occurred at a branch of the National Permanent Federal Savings and Loan Association [8] located in a small shopping center on MacArthur Boulevard. Timm, the first to enter, proceeded directly to the window of a teller, Nancy DuTeil, and again used the pretense of inquiring about opening a savings account. Unbeknown to Timm, two police officers, William L. Sigmon and William Schwartz, at the time were stationed in a back room, but, unfortunately, they had no way of watching activity inside the branch.

While Ms. DuTeil was preoccupied with Timm, Caldwell appeared at her window, this time wearing a beard and collar-length hair. As she turned to assist Caldwell at the window, he produced a gun and directed her to put money into a briefcase. Although she readily complied, Caldwell demanded to know "where . . . you keep the big money?" When she informed him that only the vault contained a larger amount, he ordered her to open it.

Her unsuccessful fumbling in the vault room was noticed by the manager, William Garnett, and as he came to investigate he too was ordered at gunpoint to open her teller's vault. At last, he obtained approximately $5,000 in old bills and about $175 in bait money from each of two tellers' drawers. Garnett and Ms. DuTeil were told to stay in the vault room for five minutes and not to set off the alarm, under Timm's threat to shoot people on the street if his orders were not followed.

As soon as the two left the premises, Garnett informed Officers Sigmon and Schwartz, the policemen in the back, that a robbery had taken place. Officer Sigmon thereupon left by the front door, the same exit used by appellants. The felony-murder in this case was soon to follow from the attempted capture of appellants and a shootout which then ensued.

Appellants had walked through a nearby parking lot, but, they turned back and began to run when they heard Officer Sigmon's demand for them to halt. Almost immediately the gunfire began, though it remains uncertain who fired first. Shooting as he ran ahead of Timm, Caldwell headed for a flight of stairs leading to an alley; following Caldwell's progress, Officer Sigmon took cover, crouching down with his left side against a retaining wall. Other law enforcement officers in the vicin-

---

**6.** The branch manager, Jean Wells, noticed them but assumed that they were police officers. She testified that

> [t]hey were very assured. I think that is the reason my judgment said they might be policemen when they walked in. They were extremely observant, self-assured. They seemed very deliberate in their actions.

**7.** Timm and Caldwell were first linked to the American Savings robbery when they were recognized coincidentally the next day by Officer Gosnell as he assisted in their arrest for the second robbery.

**8.** See note 1, *supra.*

ity were on the scene by that time, but held their fire for a variety of reasons.[9]

Officer Sigmon was in a position which blocked Timm's escape route. At a pace described as "walking" to "rather fast," Timm approached Officer Sigmon from behind, the officer, facing Caldwell, being unaware of his presence. Timm then shot the officer in the back from a distance noted by witnesses as varying from six inches to four feet. From the wound thus inflicted Officer Sigmon died.

Officer Wade Bishop then opened fire on Timm, but soon was forced to retreat and call for assistance. Timm and Caldwell managed to reach their getaway vehicle, a blue panel truck driven by a young woman later identified as Heidi Ann Fletcher,[10] and the trio escaped before police were able to complete a search of the area. Shortly after noon, however, Officers Marshall Brothers and Wince Clifton spotted the truck. Matching the physical appearance of the driver, Ms. Fletcher, with their lookout description, the officers pursued the truck and stopped it. Ms. Fletcher was removed from the driver's seat, and Timm and Caldwell from the rear.[11] Also found in the truck were items tying the occupants to the National Permanent Savings robbery.[12]

### B. *The Trial*

After various pretrial proceedings consuming several months' time, appellants reached trial. The trial, by a sequestered jury, lasted three weeks. During the first five days the Government presented its case, which involved 52 witnesses and about 120 exhibits.

The Government's proof of the events comprising the offenses on trial was unopposed,[13] and the identifications of Caldwell and Timm as participants were solid and convincing. With respect to the May 25 holdup, Caldwell was singled out both at a lineup and at trial by Ms. DuTeil and Larry Newman, a witness to the gunfight. Timm was similarly identified by Ms. DuTeil and Officer Bishop. As to the May 24 robbery, Officer Gosnell identified Timm in court, as did tellers Younger and Vance. Ms. Younger had previously picked him out of a lineup, and Ms. Vance had made an identification from a photograph of the lineup. Ms. Younger also identified a .45 caliber gun and a briefcase recovered from the getaway truck as the automatic pistol and briefcase used by Timm in the holdup. Photographs made by cameras positioned inside the robbed institutions were introduced to depict the participation of Timm and Caldwell in the holdups.

Although appellants entered the American Savings branch dressed in disguises, the attempt to mask their identities, as we have indicated, did not prove to be a problem for witnesses there. Ms. Wells, the branch manager, picked Caldwell as one of the robbers and testified that a brown wig found in the panel truck corresponded with the length and color of his hair. Ms. Younger stated that a black wig found in

---

**9.** For example, Officer Schwartz also began to return fire. At one point, he took aim at Timm but held fire to avoid hitting a civilian walking behind Timm.

**10.** Ms. Fletcher was separately indicted as codefendant of Timm and Caldwell for the offenses of May 25. In December, 1971, before the case was reached for trial, she entered a plea of guilty to those charges, and was sentenced under the provisions of the Federal Youth Corrections Act, 18 U.S.C. §§ 5005 et seq. (1970).

**11.** Timm, wounded and barely conscious, was found lying in the back of the truck.

**12.** These included a briefcase containing $7,958, some of which was the bait money; a .45 caliber automatic pistol identified as the one from which had been fired the shot killing Officer Sigmon, and cartridge cases and mutilated bullets found at the scene; a copy of a magazine, bearing Timm's fingerprints, which had been removed from Ms. DuTeil's desk; a cache of guns and ammunition, among which was an unregistered sawed-off shotgun from which the serial number had been removed; and wigs and other makeup paraphernalia. In Caldwell's pocket was a loaded handgun and an expended .38 caliber projectile identified as having been fired from Officer Bishop's gun.

**13.** See text *infra* at notes 14–17.

the truck matched Timm's hair color and length when he appeared at the branch, and Ms. Vance recognized the sunglasses and dark clip-ons worn by Timm and Caldwell.[14]

There was also a great deal of other evidence directly implicating the two men, including items uncovered by a search of the panel truck [15] and, as well, by a warranted post-arrest search of an apartment occupied by Timm and Ms. Fletcher. The weapons offenses [16] were established in part by defense stipulations as to basic elements such as non-registration and non-possession of gun licenses. A variety of witnesses testified from their expertise in the forensic sciences to provide the technical links to the robberies and the slaying of Officer Sigmon.[17]

Insanity defenses presented by appellants were their only responses to the charges, and here also the judge and jury were presented with an extensive group of lay and expert witnesses. The gist of Timm's defense was that he suffered from acute and long-standing dependency needs, and that this, coupled with Caldwell's great influence over him, brought about his participation in the robberies. In contrast, Caldwell attempted to show that at the time of the offenses he was afflicted with a "conversion hysteria"—a deep-seated complex which allegedly had progressed since childhood and which ultimately led him to seek punishment from other people. The "conversion" aspect, as interpreted by his experts, took the form of lawbreaking in hope of being caught.

Such were the offenses and the trial, viewed in rather broad outline. There were, we have indicated, many other factual developments bearing on the legal issues posed on this appeal. We elaborate on these as separate discussions of the issues are successively reached in this opinion.

## II. PRETRIAL PUBLICITY AND SELECTION OF THE JURY

### A. *Publicity and Claims of Prejudice*

Appellants jointly contend that due to widespread publicity surrounding the case they were denied the "impartial jury" guaranteed to them by the Sixth Amendment.[18] They attack both the court's refusal to order a change of venue and its failure to take more stringent measures to reduce the flow of information concerning ongoing developments of the trial.

Initially, appellants charge that a change of venue was necessitated by extensive media coverage that highlighted, among other things, Officer Sigmon's death, appellants' unorthodox life style and various controversies punctuating certain of the pretrial hearings. They specifically assert that the substance of news articles appearing in the press effectively prejudged their guilt. Furthermore, they add, the District Court's acceptance of Heidi Fletcher's plea of guilty prior to trial [19] likewise tended to implicate them. For each of several reasons, we conclude that the trial judge committed no error in finding that there was no such prejudice against appellants that they could not obtain a fair and impartial trial.

---

14. Police officers had located various articles of clothing which appellants had worn during the robberies. These included a gold jacket worn by Caldwell and wigs worn by each. See note 12, *supra*. Various witnesses described for police, and later identified in court, these items of outerwear.

15. See note 10, *supra*.

16. See note 1, *supra*.

17. Perhaps the most interesting and pertinent examples were (a) the deputy medical examiner who verified the cause of death; (b) the ballistics expert who identified the bullet as coming from Timm's .45 automatic, and who matched the indentations of the nose of the death bullet with those of Officer Sigmon's belt buckle; and (c) the technician who correlated hair fibers of Caldwell and Timm with those found on the wigs taken from the truck.

18. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ." U.S.Const. amend. 6.

19. See note 10, *supra*.

The absence of error stems primarily from appellants' failure to properly exploit their opportunities to seek a change in venue [20] and their inability in any event to show actual harm from a trial in the District of Columbia. The record discloses that in June, 1971, not long after his arrest, Timm moved before a United States magistrate for a change of venue because of post-arrest publicity, that the motion was denied without prejudice to renewal before the District Court, and, as will appear, that no suitable effort to renew the motion ever came forth. Six months later, Caldwell moved on another ground for a change of venue, which in our view the court very properly denied.[21] We note additionally that on each of two mornings while selection of a jury was under way, both appellants directed the trial judge's attention to news articles and broadcasts appearing overnight and again moved for a change of venue.[22] On both occasions, the judge spe-

cifically denied the request because there was no indication at that point that an impartial jury could not be obtained, and we cannot say that the judge's ruling was wrong.[23] In sum, we find no error in disposing of appellants' several efforts to change the place of trial, when and as those efforts were made.

Neither appellant has convinced us alternatively that the trial judge erred in failing to order *sua sponte* a severance of defendants [24] followed by a change of venue. As we stated in our opinion in Jones v. Gasch,[25] the critical question on a pretrial motion for change of venue "is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire* examination." [26] Throughout the pretrial period in this case, appellants asserted no more than the existence of widespread, uncomplimentary publicity. Where, as here, our examination of the publicity does not enable us to say that

**20.** The standard for granting a change of venue in the federal courts derives from Fed.R. Crim.P. 21(a), which reads:

The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

**21.** In December, 1972, within days after the entry of Heidi Fletcher's plea of guilty, see note 10, *supra*, Caldwell alone moved for a change of venue, claiming prejudice from publicity over the plea. No supporting documentation was filed to describe media accounts of Ms. Fletcher's new status, and the trial judge rightly denied the motion. A change of venue cannot be grounded merely upon a codefendant's entry of a plea of guilty prior to trial. The rationale is much the same as that underlying decisions that such an occurrence does not constitute ground for a mistrial if an adequate cautionary instruction is given. See United States v. Dardi, 330 F.2d 316, 332–333 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Crosby, 294 F.2d 928, 948–950 (2d Cir. 1961), cert. denied, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). See also Schliefer v. United States, 288 F. 368 (3d Cir.), cert. denied, 262 U.S. 756, 43 S.Ct. 703, 67 L.Ed. 1218 (1923); Wood v. Unit-

ed States, 279 F.2d 359 (8th Cir. 1960); Davenport v. United States, 260 F.2d 591 (9th Cir. 1958), cert. denied, 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959); Richards v. United States, 193 F.2d 554 (10th Cir. 1951), cert. denied, 343 U.S. 930, 72 S.Ct. 764, 96 L.Ed. 1340 (1952).

**22.** See U.S. Const. amend. 6, quoted in relevant part *supra* note 18. See also 1 C. Wright, Federal Practice and Procedure § 341, at 619 (1969).

**23.** See text *infra* at notes 25–26. "The burden of showing abuse of discretion in denying a motion under Fed.R.Crim.P. 21(a) is a virtually impossible one; indeed, there does not seem to be a federal case where the burden has been met." 8 J. Moore, Federal Practice ¶ 21.03[3], at 21–10 to 11 (2d ed. 1974).

**24.** See Fed.R.Crim.P. 14. See also Part V, *infra*.

**25.** 131 U.S.App.D.C. 254, 404 F.2d 1231 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968).

**26.** Jones v. Gasch, *supra* note 25, 131 U.S.App. D.C. at 261, 404 F.2d at 1238, citing Blumenfield v. United States, 284 F.2d 46, 51 (8th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961). See also United States v. Daddano, 432 F.2d 1119, 1126 (7th Cir. 1970), cert. denied, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971).

a fair and impartial jury was completely unobtainable, that assertion, without more, does "not in itself constitute a sufficient showing of prejudice."[27] As we later conclude, the jury ultimately selected for appellants' trial was untainted by the publicity of which appellants now complain.[28]

Additionally, we reject appellants' claim that the trial judge erroneously omitted to take steps to restrict the spread of information about the case. They argue that the judge should have sealed more of the pleadings, held more proceedings *in camera* and restricted the prosecution's press statements under rules in vogue in the District Court.[29] Such precautions, they contend, would have mitigated the negative effects of attendant publicity, because many news accounts were constructed from what reporters could glean from open records, courtroom observation and the questioning of anyone who would consent to be interviewed.

On none of these points do we find reversible error. Again, appellants did not avail themselves of their right to move[30] for the kinds of orders which they now contend were essential; and in the only two instances in which requests for *in camera* proceedings were denied,[31] the judge's actions were a reasonable exercise of discretion. On the first occasion, Timm alone moved the judge to hold *in camera* the hearing at which Heidi Fletcher was to enter a plea of guilty. Quite properly, the denial of this motion was bottomed upon the need for an atmosphere of openness when an accused waives his or her constitutional right to a trial. The second rejection occurred on Timm's request made orally by appointed counsel for similar treatment for a hearing on a motion to suppress identification evidence. The judge opted for a non-secret proceeding in light of opposition from Timm's retained counsel as well as the refusal of Caldwell's lawyers to adopt any position at all. In spite of the disunity among defense attorneys, the judge nevertheless admonished media representatives not to publish sketches or photographs of appellants just prior to selection of the jury.

We discern no error by the trial judge in not instituting further restriction on disclosures to the press by government personnel. Appellants do complain of news accounts containing remarks attributed to governmental sources.[32] However, we might point out categorically that whatever adverse publicity may have arisen from known Government strategy or opinion could have been materially lessened by timely requests for the sealing of pleadings and the scheduling of non-public arguments.[33] We might also point to the record

---

27. Estes v. United States, 335 F.2d 609, 613 (5th Cir. 1964), cert. denied, 319 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965), citing Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

28. See Part II(B), *infra*.

29. Dist.Ct.D.C. Local Rule 1–27, Free Press—Fair Trial—referring to the role of the trial court—in pertinent part provides:

In a widely publicized or sensational civil or criminal case, the court, on *motion* of either party *or on its motion*, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, . . . and any other matter which the Court may deem appropriate for inclusion in such an order (emphasis in original)

This rule is identical to the former Rule 100, which was in effect at the time of trial.

30. See note 3, *supra*.

31. Several proceedings were held *in camera*. We cite, for example, Heidi Fletcher's motion concerning her bail status, held August 29, 1971, and Timm's motion to have Ms. Fletcher return to testify at trial, heard on February 17, 1971.

32. Typical of the remarks under complaint was the description by a District of Columbia Department of Corrections spokesman of a suicide attempt by Caldwell while in custody.

33. A prime example of a prosecution position appearing in the press are accounts of the prosecution's belief that appellants were faking insanity. This viewpoint was extrapolated from arguments presented in open court and pleadings filed with the court in the normal course of litigation. It will be recalled that the jury was then sequestered, as it was throughout the trial.

disclosure that one of Caldwell's counsel made a series of extrajudicial statements to the press, one of which drew a critical admonition from the court; surely, in the context of these facts and in view of his urging that the trial judge should have "restricted the release of information by counsel,"[34] he is in no position to complain of publicity for which he is in part responsible.[35]

█ More importantly, there is a crucial weakness which plagues appellants' claims of error as to the handling of pretrial publicity. Appellants' only defense was insanity, not factual innocence. Thus the requirement of showing prejudice from the publicity complained of became in turn a requirement of demonstrating impairment of the ability or willingness of potential jurors to remain impartial on the insanity issue, and this appellants entirely failed to do. Throughout all of their descriptions and protestations of pretrial press coverage,[36] appellants speak of nothing

which does more than reflect on their physical participation in the crimes on trial.[37] The kind of publicity which we are asked to hold prejudicial is easily distinguished from that created when a prosecutor actively seeks a preview in the press of the contest over insanity.[38] Not even inadvertently was that done here. One who seeks to have a federal court set aside a criminal conviction has "the burden of showing essential unfairness . . . not as a matter of speculation but as a demonstrable reality."[39]

### B. The Voir Dire Examination

The issues which appellants place before us concerning the selection of the trial jury necessarily flow into their basic contention that they were prejudiced by undue publicity. We are advertent to the principle that voir dire procedures must provide "a full and fair opportunity to expose bias or prejudice on the part of the veniremen,"[40] and that "[p]reservation of the opportunity to

---

**34.** Brief of Appellant Caldwell at 57.

**35.** See Reynolds v. United States, 225 F.2d 123, 129 (5th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801 (1953).

**36.** We repeat that the jury was sequestered for the duration of the trial.

**37.** That appellants were the perpetrators of the crimes being tried was never disputed at any point in the case. Moreover, they admitted on brief that "most of [the] details were reported with reasonable accuracy. . . ." Brief of Appellant Caldwell at 53. This position was adopted by reference in Timm's brief pursuant to Fed.R.App.P. 28(i).

**38.** See, *e. g.,* United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir. en banc), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963); Fouquette v. Bernard, 198 F.2d 96 (9th Cir. 1952). In *Bloeth,* the accused was tried for his suspected commission of an alarming series of murders in a suburban New York county. The Second Circuit Court of Appeals remanded the case for a new trial based upon the conduct "from the prosecution denigrating the insanity defense and so predisposing the prospective jurors to reject it." 313 F.2d at 373. Further, said the court, "[t]he opinions formed in this case, moreover, were based not solely on accounts of the crime at issue, but on . . . . expressions of the disbelief of the

District Attorney in the lack of sanity of the defendant, with editorial attack upon the possibility of a legal loophole that by the defense of insanity would free the mad killer to strike again." *Id.*

Similarly, in *Fouquette,* the Chief Judge of the Ninth Circuit ordered a stay of execution following a murder conviction, finding probable cause that local prejudice had precluded a fair trial. In this instance, the pretrial publicity included improper press interviews by both the District Attorney and the judge who was later to try the case. The prosecutor described at length "how he framed a second confession he obtained from Fouquette to rebut his defense of insanity." 198 F.2d at 99. For his part, the trial judge expounded in the same county newspaper upon "how under the Nevada law the 'citizenry' . . . well could be exposed to future danger if Fouquette were acquitted on the ground of insanity." *Id.* We hasten to say that there was no such behavior in the case at bar.

**39.** See Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). See also Beck v. Washington, *supra* note 27, 369 U.S. at 566, 82 S.Ct. 955, 8 L.Ed.2d 98; United States ex rel. Darcy v. Handy, 351 U.S. 454, 462 (1956).

**40.** United States v. Robinson, 154 U.S.App.D.C. 265, 269–270, 475 F.2d 376, 380–381 (1973).

prove actual bias is a guarantee of a defendant's right to an impartial jury." [41]

■ Appellants argue first that the trial judge erred in not probing more vigorously the responses of potential jurors as to their exposure to press coverage of the robberies and related offenses. Furthermore, they say, the judge erroneously relied upon the personal assurances of impartiality of certain of the veniremen after only cursory questioning.

Scrutinizing the record, we are satisfied that appellants have no basis for complaining of an inadequate voir dire examination. At no time did attorneys for either appellant tender an objection to the procedure, but we pause briefly to discuss their contentions and decline to find plain error. Their counsel were granted full opportunity to propound their own questions for each potential juror, and the substance of the questions suggested by defense counsel were put to the jury by the judge. [42]

Moreover, in United States v. Robinson [43] we made clear our position on the scope of appellate review of voir dire issues. "Pursuant to Rule 24(a), Fed.R.Crim.P., the trial judge is vested with 'broad discretion' in the conduct of voir dire—both as to the mode and manner of proceeding," [44] and we said that so too does this discretion extend to "the range of questions put to prospective jurors." [45] Appellants have not demonstrated that the trial judge abused her discretion. Absent a showing of that, and that their rights were substantially prejudiced, we leave undisturbed the conduct of the voir dire examination. [46]

■ Caldwell and Timm also challenge the trial judge's reliance on the personal claims of two potential jurors that they could render a fair and impartial verdict on the evidence to be adduced. Both of these individuals, they argue, should have been stricken for cause. [47] Undoubtedly there are occasions upon which further questioning is needed to permit the trial court to make its own judgment of a juror's impartiality based on objective facts, rather than relying exclusively on the jurors' subjective determinations of whether they were preju-

41. Dennis v. United States, 339 U.S. 162, 171–172, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950).

42. Each juror was questioned individually by the judge, out of the presence of the other prospective jurors, whenever there was an affirmative answer to the question whether he or she, had heard, seen or read anything about the case. We specifically approved this procedure in United States v. Bryant, 153 U.S.App.D.C. 72, 77, 471 F.2d 1040, 1045, cert. denied, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973). See also American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.4(a) (Approved Draft 1968).

43. *Supra* note 40.

44. United States v. Robinson, *supra* note 40, 154 U.S.App.D.C. at 269, 475 F.2d at 380. See also United States v. Bryant, *supra* note 42, 153 U.S.App.D.C. at 76, 471 F.2d at 1044. *Cf.* United States v. Anderson, 165 U.S.App.D.C. 390, 400, 509 F.2d 312, 322 (1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

45. United States v. Robinson, *supra* note 40, 154 U.S.App.D.C. at 269, 475 F.2d at 380. See also Ham v. South Carolina, 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470,

75 L.Ed. 1054 (1931); United States v. Peterson, 157 U.S.App.D.C. 219, 224, 483 F.2d 1222, 1227, cert. denied, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); Brown v. United States, 119 U.S.App.D.C. 203, 204, 205, 338 F.2d 543, 544, 545 (1964); Frasier v. United States, 267 F.2d 62, 66 (1st Cir. 1959); Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956); Stone v. United States, 324 F.2d 804, 807 (5th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Alverez v. United States, 282 F.2d 435, 437–438 (9th Cir. 1960).

46. See United States v. Robinson, *supra* note 40, 154 U.S.App.D.C. at 269, 475 F.2d at 380; Yarborough v. United States, *supra* note 45, 230 F.2d at 63; Haslam v. United States, 431 F.2d 362 (9th Cir. 1970), aff'd on rehearing, 437 F.2d 955, cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

47. The law in this jurisdiction is that jurors must be excused for cause if their experience or that of their close relatives is such as to indicate the probability of partiality. See Simms v. United States, 132 U.S.App.D.C. 111, 405 F.2d 1381 (1968); Jackson v. United States, 129 U.S.App.D.C. 392, 395 F.2d 615 (1968).

diced.[48] But the record before us reveals that the judge proceeded well beyond bare formalities and committed no error in failing to eliminate either of the two persons now subject to appellants' complaint.[49]

Instead of a perfunctory determination of their eligibility to serve, the judge asked followup questions [50] and on the basis of the answers given further evaluated their exposure to pretrial publicity as well as their attitudes on the insanity defense each appellant contemplated. Appellants did not object to the seating of the first challenged venireman, and they successfully prevented the second from serving by use of a preemptory challenge.

Lest we forget, the competence of a citizen to sit on trial juries is to be measured by a common-sense standard. For this and other cases in which similar claims are made, the Supreme Court has prescribed the applicable test:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish

---

**48.** See Silverthorne v. United States, 400 F.2d 627, 638–639 (9th Cir. 1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971). "[M]erely going through the form of obtaining jurors' assurances of impartiality is insufficient." Silverthorne v. United States, supra, 400 F.2d at 638; see also United States ex rel. Bloethe v. Denno, supra note 38, 313 F.2d at 372.

**49.** The first complaint involves a prospective juror who came to the bench in response to the judge's question as to how much any of them knew about the robberies. The offending remark, according to appellants, was that "they brought Fletcher in."

Later, a second potential juror approached the bench to answer more fully the judge's query as to whether anyone believed that insanity should not be held to be a defense to a serious and violent crime. Appellants characterize as prejudicial the juror's statement, "[w]ell, I don't feel they should hide behind the plea of insanity, Your Honor."

**50.** With the first of the two potential jurors, the following questions evolved:

THE COURT: Well, did you form any opinion as to these defendants as a result of reading about Heidi Fletcher?

POTENTIAL JUROR: No, because I didn't—I think the reason I paid more attention to her was because of her father being here in the District, and the other two defendants I didn't know anything about it and I never paid any attention to the case.

THE COURT: If you were selected on the jury would you be able to determine the case, the guilt or innocence of the defendants, based solely on the evidence produced in the case

rather than any impression from anything you have read, seen, or heard?

POTENTIAL JUROR: Yes, Your Honor. I think I would.

THE COURT: If you were a defendant, would you want you as a juror?

POTENTIAL JUROR: I see no reason why I wouldn't.

The following colloquy ensued between the court and the second individual:

THE COURT: Would you tell us how you mean that, what is your reason that you feel it is not a proper defense?

POTENTIAL JUROR: Well, I don't feel they should hide behind a plea of insanity, Your Honor.

THE COURT: Suppose they are proven by testimony of psychiatrists and competent witnesses that they are suffering from or were suffering from a mental disease or defect which caused them to do the thing—

POTENTIAL JUROR: Then I would have to abide by those findings.

THE COURT: Do you feel you would be hesitant to find in that way?

POTENTIAL JUROR: Not if they were proved to be insane.

THE COURT: I would like to tell you that the burden is upon the defense to establish, by a preponderance of the evidence, that the defendants are suffering from a mental disease or defect.

Would you be able to follow the instructions with regard to that or would you feel that you would be basically prejudiced on that plea?

POTENTIAL JUROR: I feel I would be able to follow through with the instructions.

THE COURT: Very well, you may resume your seat.

an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.[51]

Our careful study of appellants' objections in light of the record persuades us to the conclusion that here the test was satisfactorily met.

Appellants would also have us find reversible error in the trial judge's failure to strike, *sua sponte*, for cause an entire class of prospective jurors—policemen's relatives. They urge that the judge was under a duty to eliminate two potential jurors who at that time were closely related to District of Columbia police officers.[52] Alternatively, they insist that the judge should have allotted them additional preemptory challenges to replace three which were used to strike others known to have law enforcement personnel within their families.

In several jurisdictions, the law is established that "[t]he mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial."[53] Logically, this premise extends the more so to jury service in a criminal trial by persons who are merely relatives of law enforcement officers.[54]

On its own facts, we are inclined to distinguish this case from claims of prejudice arising from jurors who are former victims of the same type of crime being tried,[55] or a juror who himself was closely associated with a person who has been harmed under the same circumstances as the victim involved in the case on trial.[56] As to the questioned veniremen in the present case, we observe that none was related to a police officer who had been murdered, and no juror who served is shown to have been a victim of or a witness to any offense for which appellants were indicted. We hold that, absent a specific showing of bias, a defendant accused of murdering a police officer is not entitled to a jury free of policemen's relatives.[57]

## III. PRETRIAL COMPETENCY DETERMINATION OF CALDWELL

Caldwell urges reversal of his conviction on the ground of insufficient inquiry into his mental competence to continue to stand trial after an apparent attempt to commit suicide.[58] Coupled therewith is his claim that such a significant development rendered invalid findings of competence made

---

**51.** Irwin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961).

**52.** These individuals included one whose father had been a District of Columbia police officer, another whose son-in-law was at that time a District of Columbia policeman. In addition, one of the alternates had sons in both the Los Angeles and District of Columbia police departments.

**53.** Mikus v. United States, 433 F.2d 719, 724 (2d Cir. 1970); United States v. LePera, 443 F.2d 810, 812 (9th Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); Cavness v. United States, 187 F.2d 719, 723 (9th Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1019, 95 L.Ed. 1374 (1951). See also United States v. Wood, 299 U.S. 123, 140 n. 9, 57 S.Ct. 177, 81 L.Ed. 78 (1936).

**54.** See Mikus v. United States, *supra* note 53; United States v. LePera, *supra* note 53.

**55.** See, *e. g.,* United States ex rel. DeVita v. McCorkle, 248 F.2d 1 (3d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

**56.** See *e. g.,* Jackson v. United States, *supra* note 47.

**57.** A defendant may not demand, as a matter of right, additional peremptory challenges once his original allotment has been expended. This is most certainly within the discretion of the trial judge. See Dennis v. United States, *supra* note 41, 339 U.S. at 168, 171–172, 70 S.Ct. 519, 94 L.Ed. 734. We will not disturb on appeal the judge's decision not to grant additional challenges where, as here, there is no showing of actual bias. *Cf.* United States v. LePera, *supra* note 53, 443 F.2d at 812.

**58.** On March 13, 1972, while the trial was in progress, Caldwell was discovered by a jail guard in a nonresponsive state with cuts on both arms. He was examined and treated at a hospital by a doctor and a nurse. At the request of Caldwell's counsel, the court held a competency hearing on the following day.

at an earlier hearing.[59] He also challenges the trial judge's reliance upon lay testimony at the hearings to support the conclusion that Caldwell was competent.

■ As in every case wherein the issue arises, we hold fast to the principle that "the conviction of an accused person while he is legally incompetent violates due process."[60] The purpose of a competency hearing is to determine "whether the accused is mentally competent to understand the nature of the charges against him and to assist in his defense."[61] Competence to stand trial requires "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him."[62] Caldwell's contention suffers because he misinterprets precisely what was at issue at both of his competency hearings.

■ Retracing his arguments, the only matter to be explored at the second hearing was whether Caldwell's apparent attempt to harm himself seriously rendered him incompetent[63] to further participate in the ongoing trial, not whether he was incompetent in the sense that he was mentally incapable of committing crime at the time the offense on trial occurred.[64] The latter, of course, is the insanity issue to be determined at trial. While one might argue, as Caldwell does, that attempting to destroy oneself signifies a deterioration of one's mental health, this alone does not mean necessarily that the accused is no longer sufficiently cognizant of his role in the trial and able to satisfactorily perform it.[65] In competency hearings, the limitation or expansion of the scope of testimony and the qualifications of participating witnesses lie squarely within the trial judge's discretion.[66] While the proceeding need not be lengthy or involved, "as a minimum we think the inquiry must be of record and both parties must be given the opportunity to examine all witnesses who testify,"[67] and the decision on competence must have rational support in the evidence.[68]

**59.** That proceeding had been conducted on December 2, 1971, prior to commencement of trial.

**60.** Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), citing Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

**61.** Lyles v. United States, 103 U.S.App.D.C. 22, 26, 254 F.2d 725, 729 (en banc 1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). This standard is codified by D.C. Code § 24–301(a) (1973). If circumstances generating a substantial doubt as to the accused's competence come to the attention of the court, a suitable hearing must be held. Pate v. Robinson, *supra* note 60, 383 U.S. at 385–386, 86 S.Ct. 836; Grennett v. United States, 131 U.S.App.D.C. 202, 206, 403 F.2d 928, 932 (1968); Hansford v. United States, 124 U.S.App.D.C. 387, 391–392, 365 F.2d 920, 924–925 (1966).

**62.** Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). See Pouncey v. United States, 121 U.S.App.D.C. 264, 266, 349 F.2d 699, 701 (1965).

**63.** The phrase "to assist in his defense," we have said "does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in such as accounts of the facts, names of witnesses, etc.," Lyles v.

United States, *supra* note 61, 103 U.S.App.D.C. at 26–27, 254 F.2d at 729–730. See also Hansford v. United States, *supra* note 61 (memory and intellectual abilities must not be substantially impaired); United States v. Womack, 211 F.Supp. 578 (D.D.C.1962) (competence indicated by ability to give instructions to business associates or to make plans).

**64.** See Lyles v. United States, *supra* note 61, 103 U.S.App.D.C. at 26–27, 254 F.2d at 729–730.

**65.** Compare Hansford v. United States, *supra* note 61; Lyles v. United States, *supra* note 61; United States v. Womack, *supra* note 63.

**66.** United States v. Pickett, 152 U.S.App.D.C. 346, 349, 470 F.2d 1255, 1258 (1972); Washington v. United States, 136 U.S.App.D.C. 54, 56, 419 F.2d 636, 638 (1969).

**67.** Hansford v. United States, *supra* note 61, 124 U.S.App.D.C. at 390 n. 8, 365 F.2d at 923 n. 8.

**68.** Pate v. Robinson, *supra* note 60, 383 U.S. at 385–386, 86 S.Ct. 836; Kent v. United States, 119 U.S.App.D.C. 378, 388–389, 343 F.2d 247, 257–258 (1964), rev'd on other grounds, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

In resolving the issue of Caldwell's competence at the second hearing, the trial judge fully complied with these requirements. The judge heard testimony, subjected to cross-examination, from the jail guard who discovered the attempt, and from the doctor and nurse who treated Caldwell.[69] The judge's decision not to alter the original finding was not only procedurally correct,[70] but also amply based on the evidence.[71] A decision as to whether an accused is competent to stand trial is a finding of fact which may not be set aside on appellate review unless it is clearly arbitrary[72] or erroneous,[73] and we certainly cannot say it was either.[74]

Much the same reasoning leads us to conclude that the trial judge's handling of the original competency hearing was without error. In the course of taking both lay and expert testimony, the judge sought to ferret out those rudimentary patterns of voluntary behavior which would indicate whether Caldwell's condition met the criteria for a finding of competence. Upon examination of the record, it is plain that the substance of lay testimony was supportive of Caldwell's awareness of things around him and, as well, his ability to communicate with others. In sum, the evidence was merely contradicted, and the judge found the Government's evidence more persuasive.

## IV. RESTRICTIONS ON PRESENTATION OF EVIDENCE

Since appellants offered only the defense of insanity, their complaints concerning the conduct of the trial focus importantly upon the trial judge's regulation of the content of expert testimony on that subject. Both appellants contend that their efforts to prove lack of criminal responsibility for their acts were frustrated by certain of the trial judge's evidentiary rulings. Although

69. See note 58, *supra*.

70. Caldwell deems this hearing inadequate because, *inter alia*, the trial judge failed to order further mental examinations, *sua sponte*, and allegedly ignored defense counsel's statement that he was unable to communicate with appellant. We reject these arguments. Caldwell has no reasonable basis to urge such complaints on appeal because all witnesses who testified were specifically requested by Caldwell's counsel—indeed, they were only persons whose appearances were demanded—and the judge's explicit offer to call others was declined. Moreover, uncooperativeness with one's counsel does not alone prove an inability to communicate. We discern no error in the judge's failure to expand the inquiry any further on her own motion; neither do we see error in the absence of specific reasons given for her decision.

71. Caldwell's counsel represented that Caldwell was and, since arrest had been in a trance-like state, unable to eat, talk or perform basic tasks for himself. The facts adduced at the competency hearing indicated quite the opposite. The Government called three witnesses, one of whom was an inmate, Prince A. Shannon, who had helped to care for Caldwell in the jail's infirmary. Shannon stated that during this alleged trance Caldwell ate solid food, stole food from others, bathed himself, helped a fellow inmate to learn to read, and wrote a letter and note which he asked Shannon to pass on to friends outside the jail. Similar testimony was given by a registered nurse who observed Caldwell at the jail. The final government witness was Dr. Elizabeth Strawinsky, who concluded on the basis of Caldwell's medical records and conversations with him that he was capable of communicating with others if he chose to do so.

72. See United States v. Gray, 421 F.2d 316, 317 (5th Cir. 1970); Feguer v. United States, 302 F.2d 214, 236 (8th Cir.), cert. denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962).

73. See United States v. Stone, 472 F.2d 909, 913 (5th Cir. 1973). See also United States v. Schaffer, 433 F.2d 928, 930 (5th Cir. 1970).

74. What Caldwell mainly contests is the propriety of the court's acceptance of the lay testimony offered by the Government. It has long been the law in this circuit that layman may testify as to "insanity." See, *e. g.*, United States v. Pickett, *supra* note 66, 152 U.S.App. D.C. at 348, 470 F.2d at 1257 (1972); Tatum v. United States, 88 U.S.App.D.C. 386, 390, 190 F.2d 612, 616 (1951); See also J. Wigmore, Evidence § 1938 at 36–46 (3d ed. 1940) and cases cited therein. "They may testify as to their own observations and may then express an opinion based upon those observations." Carter v. United States, 102 U.S.App.D.C. 227, 237, 252 F.2d 608, 618 (1957). We perceive no sound reason for excluding lay testimony from hearings inquiring into competence to stand trial. See United States v. Pickett, *supra* note 66, 152 U.S.App.D.C. at 349, 470 F.2d at 1258.

we find no prejudicial error, we discuss the arguments seriatum.

### A. *The Insanity Defense: Caldwell*

The first instance of alleged prejudice to the presentation of Caldwell's insanity defense began prior to commencement of the trial and culminated during cross-examination of his witnesses. The court enlisted the aid of various experts to make a pre-trial determination of Caldwell's competence to stand trial. The gist of the problem is that the judge denied Caldwell's pre-trial motion for an additional examination by a particular psychiatrist,[75] Dr. Leonardo C. Maguigad, whom Caldwell believed possessed "unique" knowledge[76] of his condition. Dr. Maguigad was the admitting psychiatrist when, following arrest, Caldwell was taken to Saint Elizabeths Hospital,[77] and Caldwell points to the anomaly created when the Government sought to impeach another psychiatrist who at trial took the witness stand on his behalf,[78] by highlighting the fact that he had not examined Caldwell until months after commission of the offenses. Caldwell argues that damage to the credibility of his witness and his defense as a whole would not have materialized had the requested appointment been made.

Caldwell's argument is erroneous for more than one reason. The only matter before the court at the time of his request was whether he was competent to stand trial. When the trial court is satisfied that it can resolve the issue of competence without additional appointments, we cannot construe the failure to do so as a denial of expert assistance for a substantive defense of insanity.[79] We emphasize the distinction between appointment of psychiatrists to aid the presentation of an insanity defense and such an appointment to assist the court in determining competence to stand trial. We stressed that distinction in a prior case:

> The purpose and nature of [an] appointment [under the Criminal Justice Act[80]] is entirely different from an examination conducted by an order of the court. The latter is conducted to serve the court in a completely nonpartisan manner. While the opinions of such an expert may assist one side or the other in a case, this is not the primary purpose for the expert's appointment. The expert appointed under [the Act], however, is not originally and primarily an aid to the court, but rather is intended to serve the interest of the defendant.[81]

Equally pertinent to the dispute is the fact that Caldwell never informed the

---

**75.** See 18 U.S.C. § 4244 (1970). See also United States v. Chavis, 155 U.S.App.D.C. 190, 194, 476 F.2d 1137, 1141, rev'd on rehearing after remand, 159 U.S.App.D.C. 30, 486 F.2d 1290 (1973).

**76.** Brief of Appellant Caldwell at 89.

**77.** Caldwell as hospitalized there shortly after his arrest, from May 28 to June 24, 1971.

**78.** The expert referred to is Dr. Alec Whyte. See text *infra* at notes 85–98.

**79.** The court was generous in its appointment of several experts to aid Caldwell with preparation of his insanity defense.

**80.** Criminal Justice Act of 1964, Pub.L. No. 88–455, 78 Stat. 552 (1964), as amended, 18 U.S.C. § 3006A (1970), legislation "designed to

provide indigent defendants in criminal cases with representation and expert service. It is clear that the Act comprehends within its definition of 'expert services' the assistance of a psychiatric expert in preparing and presenting an insanity defense." United States v. Chavis, *supra* note 75, 155 U.S.App.D.C. at 194, 476 F.2d at 1141. See also United States v. Taylor, 437 F.2d 371, 377 (4th Cir. 1971); United States v. Theriault, 440 F.2d 713, 715–716 (5th Cir. 1971), cert. denied, 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973); United States v. Schultz, 431 F.2d 907, 911–912 (8th Cir. 1970).

**81.** United States v. Chavis, *supra* note 75, 155 U.S.App.D.C. at 194–195, 476 F.2d at 1141–1142 (footnote omitted).

judge precisely what constituted the "unique" knowledge in which he was so interested. While a judge would normally choose to appoint impartial psychiatrists to render service to the court itself, the judge cannot be expected to appoint one who is sought after by a defendant, particularly without a specific showing of why no other can perform adequately.

Beyond these considerations, there is another major flaw in Caldwell's current argument. The complaint is that, because Dr. Maguigad was not appointed additionally as an examining psychiatrist for purposes of the competency determination, Caldwell suffered from the lack of Dr. Maguigad's testimony at the trial. This reasoning simply does not withstand scrutiny. On the one hand, the psychiatrist's service at the pretrial stage was no assurance of further service at the trial stage. On the other hand, despite nonappointment earlier, the psychiatrist was appointable and callable at trial.[82] In other words, his availability as a defense witness at trial was in no way dependent upon prior participation in the case. From aught that appears,[83] Dr. Maguigad was absent from the trial simply because Caldwell did not seek to have him there.[84]

Quite apart from the foregoing contention, Caldwell sets forth the additional claim that the prosecution, in violation of a discovery order,[85] withheld statements made and subsequently used them to cross-examine Dr. Alec Whyte, the only expert, among several whom the court appointed for Timm, who testified at trial in support of his insanity defense. More specifically, the Government confronted Dr. Whyte with a letter and a note written by Caldwell while he was allegedly in an unresponsive and uncommunicative state in jail. The object of the cross-examination was to contradict Dr. Whyte's opinion by a showing that the correspondence was a plea by Caldwell to friends for drugs, to be consumed in an attempt to feign mental illness.[86] The letter and note were given to the prosecution by another inmate, Shannon, and were eventually introduced into evidence through Shannon's testimony during rebuttal.[87]

▮ Our task would be simpler if we had before us a complaint involving material ordinarily discoverable under the Federal

---

**82.** See United States v. Chavis, *supra* note 75, 159 U.S.App.D.C. at 32, 486 F.2d at 1292.

**83.** The record reveals that during trial, at a hearing outside the presence of the jury, Dr. Maguigad admitted, under questioning by Caldwell's counsel, that he had seen Caldwell for only ten minutes during the process of admitting him to Saint Elizabeths Hospital. This revelation occurred during Caldwell's attempt to show that Dr. Maguigad, then a witness for Timm, lacked sufficient knowledge to testify as to Caldwell's alleged influence on Timm. This evidence leaves Caldwell's contentions curious indeed.

**84.** We might add that even if Dr. Maguigad had testified, the Government unquestionably retained the right to cross-examine all other witnesses for Caldwell.

**85.** In November, 1971, the trial judge ordered pretrial discovery in accordance with the specifications of Caldwell's written motion. In pertinent part, the order covered

all written or recorded statements . . . made by the defendants [including] . . . statements made to witnesses other than police officers at any time the defendants were in custody . . . ; all . . . documents obtained during the investigation of this case that may be used as evidence herein . . . ; and any . . . papers [or] documents . . . which the prosecuting attorney intends to use in a hearing or trial or which were obtained from or belong to the accused.

**86.** In the letter, written to a group of his friends in Virginia, Caldwell stated:

I am well in spite of outward appearances . . . I need about ten 'Lysergics' so I can pass my head test with flying colors. A woman will call you and ask for 'Vic's perscription' [sic] or you'll know her by the use of that name . . .. Ask Charlie to let me know when the test is going to occur.

The note, passed to a sixteen-year old inmate in the jail infirmary to be relayed to another inmate, showed Caldwell asking "them to·get . . . 5 to 10 LSD trips to me."

**87.** See note 86, *supra*.

Criminal Rules,[88] such as a confession,[89] a defendant's grand jury testimony,[90] or a summary of his incriminating conversation with a governmental agent.[91] But what we are called upon to decide is whether Caldwell was entitled to production of personal correspondence not addressed to the Government or intended for its view.

The decision on this question must turn upon whether Caldwell's letter and note were "statements" of the type contemplated by Criminal Rule 16(a),[92] and as such discoverable under the terms of that provision. The Government contends that the language of Rule 16(a) evinces a focus on direct communications between an accused and the Government, and not upon those to third persons which a thorough investigation happens to uncover. Furthermore, the Government reminds, the papers in question were not used as part of its effort to prove Caldwell's criminal culpability, but were held for potential impeachment of defense witnesses on the insanity issue.[93]

 We find the Government's position unacceptable. The courts have rejected arguments that the "statements" discoverable under Rule 16(a) are only those made to governmental agents,[94] and that, we think, is as it should be. The rule requires unqualifiedly the production of "written or recorded statements or confessions made by the defendant, or copies thereof within the possession, custody or control of the government . . . ,"[95]

---

**88.** In its entirety, Rule 16(a) reads:

> Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, (2) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and (3) recorded testimony of the defendant before a grand jury.

See generally United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

**89.** See note 88, *supra.* See also, *e. g.,* United States v. Aadal, 407 F.2d 381 (2d Cir.), cert. denied, 395 U.S. 967, 89 S.Ct. 2114, 23 L.Ed.2d 754 (1969).

**90.** See note 88, *supra.* See generally, Note, Discovery by a Criminal Defendant of His Own Grand-Jury Testimony, 68 Colum.L.Rev. 311 (1968).

**91.** "The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies." United States v. Bryant, 142 U.S.App.D.C. 132, 140, 439 F.2d 642, 650 (1941). See also, *e. g.,* United States v. Rosenberg, 299 F.Supp. 1241 (S.D.N.Y.1969) (transcripts of conversations with Internal Revenue Service official on occasions of alleged bribes); United States v. Mosely, 266 F.Supp. 834 (S.D.N.Y.1967) (defendant's statement to postal inspectors).

**92.** See note 88, *supra.*

**93.** We cannot agree with our dissenting colleague that Caldwell's letter and note were not "relevant" within the meaning of Rule 16(a). As applied to the accused's own damaging statements, the requirement of relevance "seems superfluous in view of the obviously vital importance of the material sought." 8 J. Moore, Federal Practice ¶ 16.05 [1] at 16–32 (2d ed. 1965). See also Xydas v. United States, 144 U.S.App.D.C. 184, 188–189 n. 9, 445 F.2d 660, 664–665 n. 9, cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); 1 C. Wright, Federal Practice §§ 251–53 (1969). The fact that the materials were used for impeachment and rebuttal does not make them any the less relevant. Caldwell's statements, in the context of his insanity defense, were by no means "tangential" or " 'beside the point' matters," but were tantamount to a confession of mental soundness.

**94.** Rule 16(a) encompasses the accused's "recorded" as well as "written" statements in the Government's possession, see note 88, *supra,* and recorded conversations between the accused and persons other than governmental agents are within the rule. United States v. Crisona, 416 F.2d 107, 114–115 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970); Davis v. United States, 413 F.2d 1226, 1230–1231 (5th Cir. 1969); United States v. Isa, 413 F.2d 244, 246 (7th Cir. 1969); United States v. Black, 282 F.Supp. 35, 37 (D.D.C.1968).

**95.** See note 88, *supra.*

and we are unable to detect in this language the limitation the Government suggests. We believe, too, that acceptance of the language for just what it says is dictated by the fundamental fairness of granting the accused equal access to his own words, no matter how the Government came by them.[96] The point is well illustrated by the instant case, wherein a coherent writing by Caldwell could have had upon the jury the net effect of a written confession of mental soundness. This case also demonstrates that the Government's attempted distinction between substantive and impeachment uses of discoverable material is untenable. Since the court's production order referred clearly and specifically to "all written . . statements made by the defendants," [97] nonproduction of the letter and note violated its terms.

■■■ Still, we must determine whether the use the Government made of the correspondence at trial was prejudicial, for if not the nonproduction cannot affect Caldwell's conviction.[98] Caldwell pictures himself as a victim of a mid-trial ambush by the allegedly abrupt reference to the letter and note during Dr. Whyte's cross-examination, but the claim of surprise is negated by the record. Caldwell's counsel was already on notice of the existence of these communications from much-earlier reference to them at the pretrial competency hearing. Neither then nor later did Caldwell request leave to inspect or copy the materials, despite their potential for further use by the Government. In these circumstances, we see no prejudice to Caldwell from their

nonproduction in response to the court's order.

## B. The Insanity Defense: Timm

[25] Presenting his insanity defense in turn, Timm utilized testimony by a clinical psychologist, Dr. Carl Bauer.[99] On the witness stand Dr. Bauer set forth his observations of Timm's mental condition as deduced from a battery of psychological tests administered by him. In an effort to forestall objection to a crucial part of the testimony, Timm's counsel proffered at the bench that if asked whether Timm could control his behavior on the dates of the two robberies, Dr. Bauer would answer in the negative. According to the witness, that was due partly to extreme dependency needs which rendered Timm easily susceptible to the influence and leadership of others. Counsel thereupon sought a ruling as to whether Dr. Bauer would be permitted to express the opinion that Caldwell's influence over Timm, in the context of the latter's mental illness, led to his participation in the offenses on trial.[100] The issue at hand is whether the trial judge, in light of objections from counsel both for Caldwell and the Government committed reversible error in sustaining the objection to that testimony.

Our starting point is our decision in Jenkins v. United States,[101] in which we held that

> [t]he determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent

---

96. See Loux v. United States, 389 F.2d 911, 922 (9th Cir.), cert. denied, 393 U.S. 869, 89 S.Ct. 156, 21 L.Ed.2d 138 (1968). See also United States v. Bryant, *supra* note 91, 142 U.S.App. D.C. at 139, 439 F.2d at 649.

97. See note 85, *supra*.

98. Compare United States v. Crisona, *supra* note 94, 416 F.2d at 115; United States v. Hauff, 473 F.2d 1350, 1355 (7th Cir.), cert. denied, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); Hansen v. United States, 393 F.2d 763, 769–770 (8th Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968).

99. Dr. Bauer, at the time, was a member of the staff of Saint Elizabeths Hospital. He saw Timm eight to twelve times and administered such commonly-known tests as the Rorschach, in addition to a handwriting or graphology test. His expert qualifications as a clinical psychologist were not challenged by the Government.

100. This effort is related also to another issue on appeal. See Part V, *infra*.

101. 113 U.S.App.D.C. 300, 307 F.2d 637 (en banc 1962).

of his knowledge. It does not depend upon his claim to the title "psychologist." And that determination, after hearing, must be left in each case to the traditional discretion of the trial court subject to appellate review. . . . When completion of [graduate] training is followed by actual experience in the treatment and diagnosis of disease in association with psychiatrists or neurologists, the opinion of the psychologist may properly be received in evidence.[102]

Basically, Timm argues that the judge's decision to prohibit the sought-after testimony "was not based upon an analysis of his particular qualifications," as directed by *Jenkins*, "but on a belief that such questions were 'psychiatric questions' and thus could not be answered by a psychologist."[103]

Terming the ruling "arbitrary and erroneous,"[104] Timm contends that he was prejudiced because the heart of his defense was never heard by the jury. Timm rightly criticizes the judge's narrowing of the testimony because of a mistaken belief that such an opinion could be expressed only by a psychiatrist. Were this the only justification offered for the ruling, such an approach would have been vulnerable in the absence of a finding that the psychologist's particular qualifications were inadequate

support for the testimony in question.[105] Without some other sound basis for excluding the testimony, it would have been error for the judge to have "disregarded *Jenkins* and turned the hearing into an inquiry into any psychologist's competence to make informed observations about [Timm] without medical training."[106]

From an examination of the record, however, we discern adequate support for the judge's ruling. Phrased most simply, Dr. Bauer had already testified to the outer limit of the factual basis for any opinion he might express. He could not properly have been permitted to proceed beyond the parameters of what he actually knew about Timm.[107] Nowhere in the record is there to be found any suggestion that Dr. Bauer had examined Timm in regard to his relationship with Caldwell. Never was there any claim that Dr. Bauer had been informed that, in point of fact, Timm was influenced by someone else to participate in the crimes charged. The proffer at the bench was far too generalized to allow the judge to draw the conclusion that the witness possessed any such information.[108]

The test for admitting expert opinion is whether it will appreciably aid the trier of fact in determining the factual is-

**102.** Jenkins v. United States, *supra* note 101, 113 U.S.App.D.C. at 308, 307 F.2d at 645 (footnotes omitted). *See, to the same effect,* United States v. Brawner, 153 U.S.App.D.C. 1, 26, 471 F.2d 969, 994 (en banc 1972); United States v. Schappel, 144 U.S.App.D.C. 240, 244, 445 F.2d 716, 720 (1971); Blunt v. United States, 128 U.S.App.D.C. 375, 377, 389 F.2d 545, 547 (1967).

**103.** Brief of appellant Timm at 102.

**104.** *Id.*

**105.** See text *supra* at note 102.

**106.** See Blunt v. United States, *supra* note 102, 128 U.S.App.D.C. at 379, 389 F.2d at 547 (footnote omitted).

**107.** The trial judge observed that Dr. Whyte "has already expressed a great deal of information which I think was proper under his qualifications and the results of the tests which he is skilled in administering." The court was con-

vinced that the witness had taken his information as far as he could. See generally, Jenkins v. *United States*, *supra note* 101; *United States* v. Riggleman, 411 F.2d 1190, 1191 (4th Cir. 1969). We discuss the need for an adequate factual basis for a psychiatric opinion more fully in Part V, *infra*.

**108.** Compare Strickland v. United States, 115 U.S.App.D.C. 5, 316 F.2d 656 (1963). Reacting to facts similar to those of the instant case, we upheld the trial court's disallowance of a psychologist's testimony because the witness "did succeed in expressing his opinion at some length", because "counsel made no clear proffer or objection" and because other defense experts had full access to the test results obtained by the psychologist. *Id.* at 6, 316 F.2d at 657. We do not mean to say that a psychologist's testimony can be excluded merely because his test results are available to other witnesses. It is, however, one of many factors going to a determination of prejudice.

sues.[109] Application of the test to a particular witness is committed to the broad discretion of the trial judge, whose ruling will not be overturned on appeal unless clearly erroneous.[110] Without knowledge somehow derived that Caldwell exerted influence over Timm in relation to commission of the crimes charged, Dr. Bauer had no factual basis for an opinion of the kind sought, and we uphold its exclusion.

Another contention by Timm in this area [111] is that the trial judge erred in upholding Heidi Fletcher's assertion of her Fifth Amendment privilege against self-incrimination when called to testify on Timm's behalf. Having been sentenced on a plea of guilty to all counts of an indictment for the May 25 robbery,[112] she appeared at the trial in response to a subpoena issued by Timm, who wished to solicit her observations of his personal habits and behavior during the period surrounding the offenses. When direct examination commenced, however, she refused to answer any questions whatsoever. Defense counsel urged the trial judge to disallow the claim of privilege, arguing that she was no longer in any danger of self-incrimination because of the plea and sentence. The Government countered with the explanation that reasonable cross-examination would necessarily and pertinently probe her whereabouts as well as her observations on the days immediately preceding the May 25 holdup of the National Permanent Federal Savings branch, and surely would encompass May 24, the date of the American Savings branch holdup, and May 21, the date of another robbery which the Government believed Timm, Caldwell and Ms. Fletcher had perpetrated.

To successfully invoke the Fifth Amendment privilege against self-incrimination, the danger of incrimination "must be real and appreciable . . . not a danger of an imaginary and unsubstantial character . . . ." [113] We believe that Ms. Fletcher's claim met that standard. There was a substantial possibility that even her indirect comments could have revealed information bolstering any effort by the Government to build a case against her for the May 21 and 24 crimes. That, indeed, was openly acknowledged by counsel who represented her for purposes of her appearance at the trial.

We think that to invoke the privilege it was not necessary as a precondition to assertion of the privilege, for Ms. Fletcher to demonstrate that she would have been forced to admit guilt, or that incidental parts of her testimony would have sealed a future conviction. As the Supreme Court has stressed:

> The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant . . . . To sustain the privilege, it need only be evident from the implication of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered

---

109. United States v. Jackson, 138 U.S.App.D.C. 143, 145, 425 F.2d 574, 576 (1970); Jenkins v. United States, *supra* note 101, 113 U.S.App.D.C. at 306, 307 F.2d at 644; United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir. 1973). See also 7 J. Wigmore, Evidence § 1923 (3d ed. 1940).

110. Turner v. American Sec. & Trust Co., 213 U.S. 257, 261–262, 29 S.Ct. 420, 53 L.Ed. 788 (1909); Pollard v. Hawfield, 83 U.S.App.D.C. 374, 376, 170 F.2d 170, 172 (1948), cert. denied, 336 U.S. 909, 69 S.Ct. 514, 93 L.Ed. 1073 (1949); District of Columbia v. Chessin, 61 App.D.C. 260, 262, 61 F.2d 523, 525 (1932); Raub v. Carpenter, 17 App.D.C. 505, 514, aff'd, 187 U.S. 159, 23 S.Ct. 72, 47 L.Ed. 119 (1901).

111. Timm raises other issues related to presentation of psychiatric testimony in his behalf. These are more conveniently discussed in connection with the claim of both appellants that they became entitled to separate trials. See Part V, *infra*.

112. See note 10, *supra*.

113. Mason v. United States, 244 U.S. 362, 365–366, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917); accord, Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Rogers v. United States, 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344 (1951).

might be dangerous because injurious disclosure could result.[114]

In the circumstances here, "we cannot say that the possibility of further incrimination was so remote as to deprive appellant of [her] fifth amendment rights."[115]

## V. SEVERANCE OF CO–DEFENDANTS

■ Not surprisingly, the issue of severance[116] emerges from arguments of both appellants. They outline three principal reasons urging reversal. In none do we find error requiring us to disturb their convictions. Appellants simply do not meet the standards we enunciated in United States v. Robinson,[117] that the movant or appellant

> must show more than the fact that co-defendants whose strategies were generally antagonistic were tried together. . . At the very least, it must be demonstrated that a conflict is so prejudicial that differences are irreconcilable and 'that

the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'[118]

The first point raised in this regard concerns the presentation of Timm's insanity defense. Timm called as witnesses Dr. Jonas Rappeport and Dr. Leonardo C. Maguigad, both of whom were expected to testify that Timm's criminal acts resulted in part from Caldwell's influence. The trial judge refused to let either expert refer specifically to Caldwell as the person responsible supposedly for Timm's participation in the robberies. Just as he characterized the judge's ruling with respect to Dr. Bauer,[119] here too does Timm claim that he was deprived of vital testimony.

■ We analyze the issue in two steps: first, whether the trial judge improperly restricted this testimony,[120] and second, whether the judge thereupon committed reversible error in deciding to continue the trial without severing the two

---

114. Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); accord, McNeil v. Director, Patuxent Institution, 407 U.S. 245, 257, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (Douglas, J.); Kastigar v. United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

115. Ottomano v. United States, 468 F.2d 269, 274 (1st Cir. 1972), cert. denied, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973). In light of this disposition, we cannot hold that the Government's failure to grant Ms. Fletcher immunity from prosecution for the May 21 and 24 robberies was a withholding of exculpatory material within the requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We note, in the same vein, that there was no general right to a grant of governmental immunity to Ms. Fletcher to secure her testimony in Timm's behalf. Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967).

116. Relief from prejudicial joinder by severance or other measures may be obtained under Fed.R.Crim.P. 14, which reads:
> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of

defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

117. 139 U.S.App.D.C. 286, 432 F.2d 1348 (1970).

118. United States v. Robinson, *supra* note 117, 139 U.S.App.D.C. at 289, 432 F.2d at 1351, quoting Rhone v. United States, 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966) (other citation omitted).

119. See Part IV(B), *supra*.

120. We use the word "restricted" because the trial judge did not literally stop the effort to attribute influence over Timm to another person. Rather, the judge cautioned Dr. Rappeport to
> indicate that [Timm] is impressionable, or however you would put it, and subject to influences of others and leave it that vague even if they assume that it was the other defendant, co-defendant, that is, Heidi Fletcher. It's immaterial but it cannot be thought to be Mr. Caldwell, at least it can't be brought out in that fashion.

defendants.[121] We answer both questions in the negative.

■ Once again we see an attempt to offer conclusory expert testimony that has no apparent factual basis.[122] This court has previously held that a psychiatric opinion offered in evidence must have a factual predicate.[123] Thus the fundamental question here is how much either expert actually knew about the relationship between Caldwell and Timm. As to Dr. Rappeport, the only information upon which he drew any conclusion about appellants' relationship was a letter, written to the prosecutor by one Monroe Cooper, purporting to describe Caldwell.[124] Cooper had not seen Caldwell at all for many months prior to the robberies, and had only slight contact with him the year before their last encounter. Equally damaging to Timm's contention are Dr. Rappeport's own words, at the bench:

> [S]ome of my final conclusions . . . are based on my feeling that Mr. Caldwell had the capability *from the little I know* or that Mr. Timm *may have been influenced* unfavorably by someone else and may have been influenced to do this and *on the basis of one letter that I have*, there seems to be some indication that Mr. Caldwell is the type of person who is quite capable of influencing him. (emphasis added).

We are convinced that as a matter of law there was an insufficient factual basis for this witness' potential testimony.[125] Of particular importance is the fact that Dr. Rappeport had ever examined Caldwell, and the further fact that he had never personally interviewed Cooper. Clinical experiences of that sort might have bolstered measurably any conclusions about Caldwell's effect on Timm. Of like significance, as the trial judge reasoned, is the consideration that the introduction of the letter into evidence for the truth of the descriptions contained in it—as a foundation for the witness' opinion—was forbidden as an admission of hearsay.[126]

Where Timm's second witness, Dr. Maguigad, is concerned, a similar deficiency unfolded at trial. He admitted in testimo-

---

121. The burden rests upon the moving defendant to demonstrate prejudice from the denial of a motion to sever. See United States v. DeSapio, 435 F.2d 272, 280 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); United States v. De Larosa, 450 F.2d 1057, 1063 (3d Cir. 1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972); Tillman v. United States, 406 F.2d 930, 935 (5th Cir.), cert. denied, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); United States v. Tanner, 471 F.2d 128, 137 (7th Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972); Williams v. United States, 416 F.2d 1064, 1070 (8th Cir. 1969); United States v. Harris, 441 F.2d 1333, 1336 (10th Cir. 1971).

122. See Part IV(B), *supra.*

123. See United States v. Brawner, *supra* note 102, 153 U.S.App.D.C. at 26, 471 F.2d at 994; Washington v. United States, 129 U.S.App.D.C. 29, 41, 390 F.2d 444, 456 (1967). See also Part IV(B), *supra.*

124. Apparently no one made any effort to secure the personal appearance of Cooper at trial.

125. Dr. Rappeport's presence in court was not by any means a total loss. He did come forth with rather extensive and specific testimony on Timm's social background, home life and the like, with ample support for his professional views.

126. We have allowed psychiatric experts to base their opinions upon reports of others customarily relied on, such as reports of psychologists. See, e. g., Jenkins v. United States, *supra* note 101. But a psychiatric opinion may not be predicated on hearsay of the kind offered here. " 'Generally speaking, the opinion of a medical expert based upon information obtained out of court from third persons is inadmissible. The same rule is followed when the question is the sanity of the defendant.' " United States v. Bohle, 445 F.2d 54, 69 (7th Cir. 1971), quoting 2 Wharton's Criminal Evidence § 519 at 344 (12th ed. 1955). See also People v. Keough, 276 N.Y. 141, 11 N.E.2d 570, 572 (1937); Seawell v. Brame, 258 N.C. 666, 129 S.E.2d 283, 287–288 (1963); 3 J. Wigmore Evidence, § 688 (Chadbourne rev. 1970). "[T]he party to be confronted by such an opinion should have the full opportunity of cross-examination," United States v. Bohle, *supra*, 445 F.2d at 65, an obvious impossibility where the person who supplied the information is not present in the courtroom.

ny that his total contact with Caldwell was only for approximately ten minutes; in his interview with Timm, there was virtually no discussion of Caldwell. For reasons just articulated, we uphold the exclusion of his opinion as to Caldwell's sway over Timm. But as with respect to Dr. Rappeport,[127] we are left with the impression that Timm did receive appreciable benefit from the restricted testimony of Dr. Maguigad. He was, for example, able to describe Timm's bouts with "schizophrenia," "depersonalization" and "dependence" and to conclude that "it is this dependency need that led him to be involved in this situation of robbery."

Timm now contends that the restriction on this line of testimony, assertedly necessary also to protect Caldwell's rights,[128] prevented him from presenting his full defense. Therefore, he argues, the court should have granted his motion for severance. This motion was tendered to the court in mid-trial, at the bench during the conference on Dr. Rappeport, and such tardiness gives us pause. We cannot ignore the fact that, long before the convening of trial, counsel for both appellants knew the nature of their respective defenses. To enable the court to deal effectively with problems arising from conflicting defenses, motions for severance should be tendered at a time sufficiently early to allow a reasonable opportunity therefor.

Without equivocation, we have held that

> [t]he decision to grant a severance of defendants properly joined for trial is one over which the trial court possesses great discretion and exercise of that discretion will be reversed on appeal only when it is shown to have been clearly abused. The general rule is that defendants charged with jointly committing a criminal offense are to be jointly tried.[129]

This general rule finds justification in a number of considerations. The joint trial

> 'expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.'[130]

The essence of the trial judge's duty on a motion for severance is to determine wheth-

---

**127.** See note 120, *supra*.

**128.** The trial judge felt that there was such a necessity. Our holding that neither Dr. Rappeport nor Dr. Maguigad had sufficient factual foundations for the opinions Timm wanted them to state sustains the judge's ruling in any event. Since, however, there is an alternative basis for the ruling, we discuss it.

**129.** United States v. Gambrill, 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971). See also United States v. Hurt, 155 U.S.App.D.C. 217, 222, 476 F.2d 1164, 1169 (1973); Brown v. United States, 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315, cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); Lucas v. United States, 70 App.D.C. 92, 93, 104 F.2d 225, 226 (1939). And see Fed.R.Crim.P. 8(b), which reads:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Other courts as well have stated that the trial judge has wide latitude in granting or denying severance, and that an abuse of discretion must be shown in order to prevail upon a claim of error. See, e. g., Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Brown, 335 F.2d 170, 172 (2d Cir. 1964); Tillman v. United States, *supra* note 121, 406 F.2d at 934; Williams v. United States, *supra* note 121, 416 F.2d at 1070; Butler v. United States, 317 F.2d 249, 264 (8th Cir.), cert. denied, 375 U.S. 838, 84 S.Ct. 77, 11 L.Ed.2d 65 (1963); United States v. Tanner, *supra* note 121, 471 F.2d at 137; and see generally, 8 J. Moore, Federal Practice ¶ 14.02 [1] at 14–3 (2d ed. 1968).

**130.** United States v. Hines, 147 U.S.App.D.C. 249, 266, 455 F.2d 1317, 1334, cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972), quoting Parker v. United States, 404 F.2d 1193, 1196 (9th Cir. 1968), cert. denied, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969). See also United States v. Leonard, 161 U.S.App. D.C. 36, 46, 494 F.2d 955, 965 (1974).

er the alleged antagonism between codefendants is "counter productive to the normal reasons for trying the cases jointly." [131]

The denial of the severance motion in the case at bar was not an abuse of discretion. A variety of factors had to be weighed in determining whether Timm and Caldwell should remain together in a single trial until the very end. The trial had already begun, after many months of hearings, examinations, witness-interviews and preparations by the court as well as by the lawyers involved. Potential jurors for any future retrials had been exposed to whatever news coverage ensued after sequestration of the original jury. Moreover, despite the lack of coordination between the two codefendants, their witnesses were able to make their basic positions clear to the jury. In light of appellants' contentions that they suffered from pretrial publicity,[132] an even louder cry of prejudice might have resulted from the coverage of such a dramatic turn of events as mid-trial severance. Taking into account the overall considerations of judicial economy,[133] we cannot say that the trial judge abused her discretion.[134]

The second reason for severance, urged by both appellants, is that the case was too complex for the jurors to understand because of two insanity defenses and varying psychiatric explanations. Additionally, appellants assert that the presentation of the evidence was overly fragmented, and that the Government's rebuttal did not sufficiently distinguish between the two appellants.

This issue was raised at trial only once, when the judge denied a request for a cautionary instruction during the Government's rebuttal, stating her intention to so instruct at the close of trial. At that time the jurors were admonished that they were to determine guilt, innocence, or lack of guilt by reason of insanity as to each defendant separately, and that evidence admitted solely as to one defendant could not be considered against the other. This instruction was one of the last given to the jurors just prior to the beginning of their deliberations.[135] Neither appellant objected

---

**131.** United States v. Gambrill, *supra* note 129, 146 U.S.App.D.C. at 88, 449 F.2d at 1163.

**132.** See Part II(A), *supra*.

**133.** There is a substantial public interest in maintaining joint trials of codefendants. See note 9, *supra,* and accompanying text. See also United States v. Lemonakis, 158 U.S.App. D.C. 162, 172, 485 F.2d 941, 951 (1973), cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); United States v. Gambrill, *supra* note 129, 146 U.S.App.D.C. at 87, 449 F.2d at 1163; United States v. Robinson, *supra* note 117, 139 U.S.App.D.C. at 289, 432 F.2d at 1351.

**134.** We note in passing other assertions by appellants that each was prevented from effectively developing his defense because of trial joinder—assertions we regard as even more plainly insubstantial. First, Caldwell states that because Timm placed upon him chief responsibility for the crimes, the joinder was prejudicial. But as we have outlined in text, Caldwell's objections to potentially damaging testimony on that score were largely successful. See text following notes 116–122, *supra*. Second, Timm expresses criticism of his codefendant's refusal to stipulate to "formal" testimony, a move which lengthened the parade of government witnesses relating incriminatory details. Timm's motion to sever because of such refusals was correctly denied. As the Government explains, Caldwell did stipulate to various other facts; the remaining items to which the Government was willing to stipulate, but Caldwell was not, lengthened the trial only minimally; and the Government never agreed to stipulate to expert testimony, as was its right. No defendant can demand as of right a stipulation by his codefendant; the "general rule [is] that '[a] party is not required to accept a judicial admission of his adversary, but may insist on proving the fact.'" Parr v. United States, 255 F.2d 86, 88 (5th Cir.), cert. denied, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958). See also United States v. Cockerham, 155 U.S. App.D.C. 97, 100, 476 F.2d 542, 545 (1973); United States v. Mishkin, 317 F.2d 634, 638 (2d Cir.), cert. denied, 375 U.S. 827, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963); United States v. Brickey, 426 F.2d 680, 686 (8th Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); Alire v. United States, 313 F.2d 31, 34 (10th Cir. 1962), cert. denied, 373 U.S. 943, 83 S.Ct. 1554, 10 L.Ed.2d 699 (1963).

**135.** *Cf.* United States v. Brown, *supra* note 129, 335 F.2d 172; Hanger v. United States, 398 F.2d 91, 100 (8th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969) (no prejudice arising from close nature of codefendants' relationship with proper instructions on individual guilt).

or requested any amplification of the charge. Consequently, plain error affecting substantial rights of the parties not being apparent, we do not consider the point.[136] We would in any event be hard pressed to find this a poorly-presented or abnormally complicated case, untriable by a District of Columbia jury.[137]

In their final arguments demanding reversal on account of insanity-related rulings, each appellant claims that the conduct of the other cast doubts upon the genuineness of his insanity defense. Caldwell points to Timm's verbal interruptions of the proceedings; and Timm cites Caldwell's "trance" during various periods of trial, particularly during the Government's rebuttal. So far as Caldwell's actions are concerned, we are cited to no specific facts tending to show that his strange behavior worked to the detriment of Timm. All we are told by counsel is that "[i]f the jurors concluded from their observations of Caldwell during the remainder of the trial that his defense was a sham[,] [t]hey might well have been misled into believing that Timm's defense also was insubstantial."[138] We are not at liberty to upset otherwise valid verdicts on bald speculation.

 Caldwell likewise claims that the jury could have viewed him as a malingerer because of Timm's yelling and verbal remarks at the prosecutor and at various witnesses. But here again Caldwell fails to set forth anything to show how these occurrences, without more, damaged his defense, and we cannot hold without an adequate factual basis that there was a carryover effect. Timm's behavior in the courtroom was not beyond the bounds of what might reasonably be expected at a trial of any defendant seeking to persuade the jury that he is mentally unbalanced. To win severance, a codefendant "must show that substantial prejudice derives from the joint trial and not merely that he would have had a better chance of acquittal were he tried separately."[139]

## VI. THE PROSECUTOR'S SUMMATION

Appellants have articulated several complaints about the prosecutor's closing argument, charging him with "belittling" their expert witnesses and improperly characterizing the insanity defenses. Our scrutiny of what was actually said, in proper context, unearths no error as to verbal remarks or prosecutorial behavior.

### A. *Closing Argument Regarding Caldwell*

Under the canopy of "belittling" expert witnesses, Caldwell describes two instances in which government counsel allegedly ridiculed testimony by Dr. Whyte, a witness for Caldwell,[140] without any foundation for criticism. First, the prosecutor recalled for

---

**136.** Fed.R.Crim.P. 30 reads in pertinent part:

. . . No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

See United States v. McClain, 142 U.S.App. D.C. 213, 217, 440 F.2d 241, 245 (1971); Spriggs v. United States, 133 U.S.App.D.C. 76, 77, 408 F.2d 1279, 1280 (1969).

**137.** Federal courts of appeals have found severance to be unwarranted in trials involving a greater number of codefendants, and more complicated factual issues. See, *e. g.,* Brown v. United States, *supra* note 129, 126 U.S.App. D.C. at 139–140, 375 F.2d at 315–316 (three defendants charged with felony-murder, one of

whom delayed the trial five days because of severe emotional outbursts); United States v. Stromberg, 268 F.2d 256, 264–265 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959) (bribery and narcotics conspiracy prosecution of 19 defendants); United States v. Lebron, 222 F.2d 531, 535 (2d Cir.), cert. denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955) (sedition conspiracy of 13 defendants); Butler v. United States, *supra* note 129, 317 F.2d at 264 (mail fraud prosecution of 30 defendants on 33 counts).

**138.** Brief of Appellant Timm at 123.

**139.** United States v. Calabro, 467 F.2d 973, 987 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973) (citation omitted).

**140.** See Part IV(A), *supra.*

the jurors Dr. Whyte's response to a question as to whether he still believed that Caldwell was in his conversion hysteria despite his seemingly normal behavior at the jail.[141] Dr. Whyte's answer, which he later admitted "was a bit flip," was that his diagnosis would remain unaltered even if Caldwell "sat down and wrote a novel." Dr. Whyte sought to emphasize that isolated incidents of voluntary behavior were in his professional opinion, not necessarily inconsistent with a diagnosis of conversion hysteria. Caldwell decries the prosecutor's focus on this one remark, during final argument to the jury, as a basis for challenging the whole of Dr. Whyte's testimony.

Similar criticism is leveled against the Government's repetition of the view expressed by Dr. Whyte as to the significance of the letter written by Caldwell in which he asked his friends for drugs.[142] Without repeating our earlier description of the content of that correspondence,[143] we note Dr. Whyte's conclusion that it indicated that Caldwell wanted to be found sane. The prosecutor attacked this opinion, saying that "from a psychiatrist who presumably understands the English language" the conclusion drawn was "absurd" and "totally undermine[s] the very basis of his testimony."

Caldwell attacks this prosecutorial approach as "inconsistent with the very concept of psychiatry, whose function is to explore the hidden meanings of human behavior." "The statements," he says "amount to an attack on any defense grounded in this science."[144] He continues, "there was no showing by the Government either that Dr. Whyte had 'misconstrued'

the letter or that he did not understand the English language."[145] Caldwell believes that, in view of the testimony as rendered, the Government had no basis for the "extreme" suggestion to the jury that there was "no evidence to support the fact that he . . . [was] in a conversion hysteria."[146]

It is clear that the prosecution struck hard blows but not foul ones.[147] Just as any vigilant advocate would be expected to do, government counsel merely capitalized on apparent weaknesses in the testimony. In regard to the diagnosis of conversion hysteria, as a tactical matter the prosecutor seized upon what arguably might not make sense to a jury of lay people.[148] With respect to the letter, the prosecutor merely expressed the Government's position that the most reasonable interpretation of its contents was that Caldwell was attempting to secure drugs to induce an abnormal mental state, knowing that a psychiatrist's diagnosis of insanity would be most advantageous. The prosecutor in no way acted unfairly by espousing the more literal of two possible meanings of the writing; that was a classic subject for argument. The Government and the defense were diametrically opposed as to the interpretation of Caldwell's ambiguous message,[149] as Dr. Whyte himself observed, "the content of the letter from the psychiatric point of view has to be evaluated like anything else. It may mean what it says and may mean something quite different."

We may similarly dispose of Caldwell's contention that there was no showing that Dr. Whyte's construction of the letter

141. See note 70, *supra*.

142. See Part IV(A), *supra*.

143. See note 86, *supra*.

144. Brief of Appellant Caldwell at 99.

145. *Id.*

146. *Id.* at 100.

147. "[W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods cal-

culated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). See also United States v. Ash, 413 U.S. 300, 320, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); United States v. Phillips, 155 U.S.App.D.C. 93, 94, 476 F.2d 538, 539 (1973).

148. See note 160, *infra*.

149. See note 86, *supra*.

was erroneous. Whether argument to the jury fully coincides with the evidence is a matter to be decided by the jury as part of the process of determining innocence or guilt.[150] This factfinding process in turn is to be guided by the jurors' personal recollections of the proof.[151] Thus, in the instant case, the mere use in summation of such criticisms as "absurd," without an accompanying recitation of the allegedly supporting evidence, was a characterization that counsel could properly urge, and which the jury could accept or disregard as it saw fit.

The episode in which the prosecutor labeled Caldwell's defense a fraud involved a series of remarks, generally that it was "a big fake of a desperate person who has no other conceivable defense." Caldwell argues that such comments to the jury were inflammatory and prejudicial, because Caldwell's expert witness testified that he had considered and rejected the possibility of malingering and that he ultimately concluded that Caldwell really was mentally ill. We say unhesitatingly that a prosecutor is not precluded from challenging the genuineness of an insanity claim simply because a defense witness has himself rejected the view that the defense is feigned. Our adversary system of conducting criminal trials encompasses no device whereby the accused is forever insulated from attack by offering a witness whose opinion undertakes to refute facts and circumstances in evidence which support a contrary theory of the case.

Here the prosecution's argument did not lack evidentiary support. Caldwell's defense of insanity was called into question, not for the first time in summation, but much earlier during the trial itself. That was accomplished partly through the testimony of a fellow inmate at the jail, who pictured Caldwell as behaving normally, as well as by circumstances such as the letter and the note Caldwell endeavored to send to his friends.[152] Having determined that the argument complained of was not without adequate basis in the record, we lay aside Caldwell's averment that the prosecutor impermissibly expressed personal views on the issue [153] and argued facts not in evidence.[154]

## B. Closing Argument Regarding Timm

Timm's first accusation [155] is that the prosecutor misstated the conclusions of Dr. Bauer in summarizing his testimony during his final argument. The alleged misstatement concerned Dr. Bauer's comments on Timm's malingering. When asked whether he had found evidence of faking or manipulation of test results on Timm's part, Dr. Bauer answered in the affirmative. He then tempered his reply with the explanation that malingering is seen "in all patients to some extent," and "stems to a great measure from both emotional fear and despondency, as well as to confusion as to what is actually happening." Referring to Timm, he described it as "beautifully

150. See note 151, *infra*.

151. See, *e. g.*, Cross v. United States, 122 U.S. App.D.C. 283, 285, 353 F.2d 454, 456 (1965); Gimbel Bros., Inc. v. Markette Corp., 200 F.Supp. 95, 99 (E.D.Pa.1961), aff'd, 307 F.2d 91 (3d Cir. 1962).

152. See Part IV(A), *supra*. Thus Caldwell is mistaken when he asserts that there was "no evidence in this case to support the Government's repeated charge that Caldwell was 'faking' an insanity defense." Brief of Appellant Caldwell at 102.

153. Counsel may not interject their personal opinions concerning the veracity of witnesses. See Harris v. United States, 131 U.S.App.D.C. 105, 107, 402 F.2d 656, 658 (1968); Gibson v. United States, 131 U.S.App.D.C. 163, 164–165 n.1, 403 F.2d 569, 570–571 n.1 (1961). *Cf.* Greenberg v. United States, 280 F.2d 472, 473–475 (1st Cir. 1960).

154. Counsel may not base their arguments on facts not in evidence. See Berger v. United States, *supra* note 147, 295 U.S. at 84–88, 55 S.Ct. at 631–633; Johnson v. United States, 121 U.S.App.D.C. 19, 21, 347 F.2d 803, 805 (1965). See also United States v. Jones, 157 U.S.App. D.C. 158, 164, 482 F.2d 747, 753 (1973); United States v. Hayward, 136 U.S.App.D.C. 300, 304, 420 F.2d 142, 146 (1969).

155. Timm also adopts the arguments made by Caldwell but we reject these points for the reasons stated above.

poorly done." In his closing argument, Government counsel urged that this testimony, even as modified, was a significant detraction from Dr. Bauer's ultimate finding that Timm suffered from mental illness.

We are not persuaded that such argument was impermissible. In truth, there was some evidence of malingering, and it was for the jury to decide what if any weight would be attached to it. The trial judge fully appreciated the possibility that some testimony might have been referred to out of context; and she prudently instructed the jurors that counsels' summations were intended to include only what they deemed deserving of special attention, and that the jurors' recollection of the evidence, not counsels' was controlling.

▇▇▇ Another line of witness-questioning was also reiterated by the prosecutor in closing argument. During the course of administering a number of psychological examinations, Dr. Bauer employed what is colloquially known as the "house-tree-person" test. Basically, it consists of directing the patient to draw each of those three figures and inferring therefrom his feelings about himself and society. Based on this examination and others, Dr. Bauer concluded that Timm was suffering from a mental disease. Quite candidly, Dr. Bauer stated:

> I would not wish the Court to think that on the basis of that drawing in itself I would draw any conclusion of any consequence.
>
> It is one of the blocks in the information which I have gathered. It is significant in that it does correlate with all the other information.

The prosecutor, however, attempted to condense Dr. Bauer's entire testimony, saying "[a]nd yet, according to him, because Timm drew a figure like this, Timm is mentally ill."

Caldwell now contends that the essence of this witness' testimony was distilled by the prosecutor to such a form that it placed disproportionate emphasis upon one of the psychological examinations. We believe, however, that the prosecutor's argument did not provide that much of a twist. While the prosecutor's language was somewhat exaggerated, and while several steps in Dr. Bauer's process of deduction were omitted, nevertheless the statement by government counsel appeared to be little more than an expression of the net result of Dr. Bauer's examinations.

▇▇▇ There is a third point which by our assessment is no more substantial in nature. According to the prosecutor's summation, the only examination from which Dr. Bauer found evidence of Timm's dependency needs was the handwriting or graphology test.[156] The accuracy of the prosecutor's statement is not perfect, for Dr. Bauer noted in testimony that dependency was a "theme" which was "consistent throughout the interviews and tests. . . ." The graphology test was, however, the only examination from which he concluded specifically that Timm suffered from "arrested dependency needs".[157] We deem the variation innocuous.

Lastly, we are urged to find reversible error in what is viewed as an attempt to use evidence admitted only as to Caldwell to rebut the insanity defense advanced by Timm. To recapitulate the pertinent testimony, Dr. John R. Cavanaugh was called to the witness stand by the Government during rebuttal. At one point he replied to the prosecutor on direct examination "that the quiet, calm, peaceful attitudes of the indi-

---

**156.** See note 157, *infra*.

**157.** Caldwell also contends that the prosecutor improperly made light of Dr. Bauer's method of psychological analysis, namely, inclusion of use of the graphology test. By definition, that examination is an interpretation of a person's emotional makeup from handwriting characteristics, writing pressure and the like. We think the prosecutor was well within his right to criticize when he attempted to offset the importance of the test by telling the jury that it was not a standard intelligence test of the kind previously administered to Timm, and that it was a matter of personal interest to Dr. Bauer because it was the subject of his doctoral dissertation.

viduals on the various occasions that you have described, are incompatible with mental illness." The trial judge responded favorably to defense counsel's prompt objection that Dr. Cavanaugh had never examined Timm, and that therefore this testimony should not be allowed to refer to him. Counsel was then permitted to have Dr. Cavanaugh acknowledge that fact before the jury. Despite this, and the judge's ruling sustaining the objection, the prosecutor queried during his closing argument, "although [Dr. Cavanaugh] examined only the defendant Caldwell and his testimony related to him directly, does not what he said apply, in effect, to both?" The judge overruled an objection to this second reference to Dr. Cavanaugh's testimony because the jury had already been informed that he had only examined Caldwell.

■■■ In light of the court's ruling on the initial objection, permitting the reference to both individuals was error. But we are mindful of several other items which in any event save the prosecutor's comments from being more than harmless error. Dr. Cavanaugh was not attempting, at the time of his remark, to present a psychiatric diagnosis of Timm, but merely a categorical observation which might well have been rested upon evidence already adduced. Nothing the observation assumed with respect to Timm was a fact not in evidence;[158] the testimony itself, we repeat, was already admitted into the record as to Caldwell. The prosecutor's statement was pure argument, not a factual account or the recitation of a phantom medical opinion.[159]

In sum, our review of these aspects of the Government's summation shows that essentially they were direct appeals to the common sense of the jurors.[160] Contrastingly, we find no indication that they approached a "know-nothing appeal[ ] to ignorance."[161] In them we perceive no basis for upsetting the verdicts.

## VII. INSTRUCTIONS TO THE JURY

According to both appellants, the trial judge erred in fashioning instructions for the jurors in each of three different areas of the litigation. The first two complaints involve the denial of requested instructions on specific aspects of the case; the last is more realistically an argument against the assignment to appellants of the burden of proving the insanity defenses they sought to erect.

Caldwell submitted to the judge a proposed instruction on second degree murder which stated that, if he were convicted, the punishment would be "up to life, or not less than twenty years." The judge declined to employ such a statement in the charge to the jury. Addressing its more obvious shortcoming, the Government points out that the request, as so phrased, incorporated an inaccurate representation of the law, for the proposed wording implied that a person found guilty of second degree murder would be incarcerated for at least twenty years. An instruction informing the jury of sentencing possibilities would have correctly stated that the minimum range of actual confinement, in terms of parole eligibility, is from one day to one-third of twenty years.[162]

■■■ In point of fact, the trial judge did charge the jury on the elements of second degree murder, as a lesser included offense of first degree murder, but the underlying

---

**158.** See note 154, *supra*.

**159.** In characterizing these remarks as harmless error, we do not regard the error to be serious enough to warrant a "prophylactic" reversal. See United States v. Bell, 165 U.S.App. D.C. 146, at 165, 506 F.2d 207, at 226 (1974).

**160.** "[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen . . . .." Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970). See also United States v. Brawner, *supra* note 102, 153 U.S.App.D.C. at 14, 471 F.2d at 982.

**161.** United States v. Brawner, *supra* note 102, 153 U.S.App.D.C. at 36, 471 F.2d at 1004.

**162.** See D.C.Code §§ 22–2403, 24–203 (1973).

issue raised by appellants is whether they were entitled to any sort of instruction specifying the penalty for that offense. We hold that they were not. The judge ruled that such an explanation is required by law only for the charge of first degree murder,[163] but that in every other instance sentencing in this circuit is solely the province of the court, not of the jury. We agree with the trial judge that that is an accurate view.[164]

Timm requested an instruction relating to an incident which occurred on cross-examination of one of his expert witnesses. During questioning by the prosecutor, Dr. Maguigad testified that he had been retained by Timm's father; when asked whether his fee had been paid prior to his appearance in court, he answered in the negative. Thereupon Timm's counsel objected at the bench, urging that such a line of inquiry was irrelevant. The court agreed, but responded that it would "just . . . let the whole thing lie," and the matter was pursued no further at that time. At the close of the case, however, Timm asked that the jury be instructed "on the fact that expert witnesses are entitled to be paid for their services." In denying this request, the trial judge concluded that it was "not necessary at this point."

We sympathize with Timm's apprehension that jurors might have concluded that, since he had not been paid, Dr. Maguigad's compensation would depend on the success of his testimony. And we think that the better practice would have been to give a cautionary instruction immediately following such an improper question. As to Timm's request for the instruction just prior to the jury's retirement for deliberations, the judge estimated that the impact of the question had been dissipated by the lapse of time between its asking and the charging of the jury; in short, that remark was of a minor nature in the context of a three-week trial, and perhaps more harm would have been done by dredging the subject up once again. On this point we defer to the trial judge's evaluation, based as it was upon first-hand observation of the entire range of events which transpired during the trial.

The final contention goes to the substance of the instruction on burden of proof of insanity. The question is whether the court properly charged that appellants had to establish their insanity defenses by a preponderance of the evidence for both the federal and the District of Columbia code offenses on trial.[165] The District of Columbia Court Reform and Criminal Procedure Act of 1970[166] modified the existing practice by enactment of a new provision, the present Section 24–301(j) of the District of Columbia Code to impose the burden of proof of insanity upon the defendant.[167] In their briefs appellants argued that having to maintain that burden is a denial of due process of law; additionally, they argued, the instruction erroneously required them to prove the productivity element of their insanity defenses.[168]

In this court's decision in United States v. Greene,[169] announced subsequent to the fil-

---

163. The instruction on possible penalties for first degree murder is required by D.C.Code § 22–2403 (1973).

164. In Lyles v. United States, *supra* note 61, we concluded that not all laymen can be presumed to know the true meaning and impact of a verdict of not guilty by reason of insanity. Therefore, we held, jurors must be informed of the relevant consequences of such a finding, to supplement their common knowledge of the simpler verdicts of guilty and not guilty. *Id.*, 103 U.S.App.D.C. at 25, 254 F.2d at 728. That, of course, is a situation very different from the one presented here.

165. See note 161, *supra*.

166. Act of July 29, 1970, Pub.L. No. 91–358, 84 Stat. 473.

167. D.C.Code § 24–301(j) (1973).

168. The substantive insanity rule in effect at the time of the trial was the formula laid down in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (en banc 1954), and McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (en banc 1962), which have been superseded by United States v. Brawner, *supra* note 102.

169. 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973).

ing of appellants' briefs, both of these arguments were squarely rejected as to trials of nonfederal offenses in the District Court.[170] The *Greene* opinion holds that as to such trials Section 207(6) involves no due process or equal protection violation,[171] and permits no distinction between productivity and other elements of an insanity defense.[172] Appellants continue to urge, however, that the requirement that an accused in the District of Columbia prove insanity as a defense to a federal criminal charge denies the equal protection of the laws since in every other federal district that burden rests with the Government.[173] This question was expressly left open in *Greene*[174] and appellants ground their position on United States v. Thompson,[175] an earlier decision of the court. Appellants read *Thompson* as a barrier to adoption of a common standard of proof for District of Columbia and federal charges if that standard differs adversely from one in vogue for defendants in criminal cases in federal jurisdictions elsewhere in the Nation. With equal vigor, the Government defends the application of Section 207(6) to trials of federal as well as nonfederal offenses committed in the District of Columbia.

We deem it unnecessary, however, in the circumstances presented, to resolve on the merits that issue in the instant case. We note, on the one hand, a serious and complex constitutional question with no controlling precedent directly in point, and the toll its decision will take on the court's resources at this time. On the other hand, we note the interrelationship of numerous convictions of appellants stemming from facets of two separate but internally integrated criminal episodes,[176] and the concurrency of the sentences, in all instances save one, which the trial judge imposed on those convictions.[177]

To recapitulate, Timm incurred nine nonfederal convictions, and Caldwell eight, on which each was sentenced to incarceration for terms extending upwardly to life imprisonment.[178] Eliminating therefrom, as we must, three duplicitous convictions of each applicant for lesser-included offenses,[179] both appellants are left with multiple nonfederal convictions and the same range of sentences, all of which we are prepared to affirm. As it is, with respect to the federal convictions, one of the three for bank robbery—by each appellant—must be vacated as invalid,[180] and the

**170.** United States v. Greene, *supra* note 169, 160 U.S.App.D.C. at 28–32, 489 F.2d at 1152–1156.

**171.** *Id.* at 29–32, 489 F.2d at 1153–1156.

**172.** *Id.* at 28, 489 F.2d at 1152.

**173.** See *id.* at 29, 489 F.2d at 1153.

**174.** *Id.*

**175.** 147 U.S.App.D.C. 1, 452 F.2d 1333, cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

**176.** See note 1, *supra*. Appellants also contend that the Federal Bank Robbery Act, codified in 18 U.S.C. § 2113 (1970), under which appellants jointly incurred three convictions, see note 1, *supra*, supersedes the general provisions of the District of Columbia Code and thus, they assert, bars prosecution under the latter for a felony-murder occurring in a federally-insured financial institution. We reject this position. In regard to the effect of passage of the Bank Robbery Act, the argument is contrary to general principles of prosecutorial discretion, Hutcherson v. United States, 120 U.S. App.D.C. 274, 277, 345 F.2d 964, 967, cert.

denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965), and the legislative history of the Act does not indicate a congressional intent to limit that discretion in this manner. See H.R. Rep.No.1461, 73rd Cong.2d Sess. 2 (1934). See also United States v. Greene, *supra* note 169, 160 U.S.App.D.C. at 27, 489 F.2d at 1151.

**177.** See note 1, *supra*.

**178.** See note 1, *supra*.

**179.** These are the convictions on counts 4, 10, and 14, for assaults with dangerous weapons on the victims of the armed robberies charged in counts 2, 8 and 12. See note 1, *supra*. The Government concedes that these convictions must be vacated under our decisions in United States v. Benn, 155 U.S.App.D.C. 180, 185, 476 F.2d 1127, 1129 (1972), and United States v. Johnson, 155 U.S.App.D.C. 28, 29, 475 F.2d 1297, 1298 (1973).

**180.** The count to be vacated must be one of the two from the May 25 robbery, for it is clearly improper to charge separate counts of federal bank robbery as to each individual teller involved. United States v. Canty, 152 U.S.App.

two remaining and two additional federal convictions bear sentences shorter than, and concurrent in operation with, the life terms assessed on the nonfederal felony-murder conviction.[181] The net result is that the sentences on the federal convictions contribute nothing whatsoever to the penalties which appellants owe to society in consequence of the nonfederal offenses.

Four years ago, we faced a cognate situation in United States v. Hooper,[182] and there we laid down a doctrine which has done useful service to this court and, in the longer run, to the community.[183] There an appeal brought on for review two convictions, one federal and the other nonfederal, arising out of a single robbery, and tendered for decision the difficult question whether both convictions and the concurrent sentences on them could stand. Since we found no error warranting reversal of the nonfederal conviction, we saw "no reason to devote our time and energies to research, and opinion-writing, incident to appropriate determination of an issue not governed by controlling precedent when no present public interest or need is furthered thereby."[184] We declared that "[i]t better serves the general interest of the administration of justice if the court limits its resources to the determination of those questions and cases that must be decided,

especially in view of the ever-mounting docket that besets this and other appellate courts."[185] Adverting to our "broad discretion"[186] statutorily conferred [187] "to direct the entry of such judgment or order as will further the interest of justice,"[188] and observing that vacation of the federal conviction and sentence "does not impair any need of the government, avoids the possibility of adverse collateral consequences to defendant, and furthers the general interest of the administration of justice,"[189] we felt "it in the overall interest of justice that, without determination of the merits," we vacate the conviction on the federal charge.[190]

We think these considerations chart the same course here. Accordingly, we vacate the federal convictions and the sentences levied upon appellants.[191] We instruct, as we did in Hooper, that "[i]f it later develops that the interest of justice so requires, the sentence[s] can be reimposed on a concurrent basis,"[192] and that "[t]he conviction[s] could then be subject to appellate review."[193] We vacate also the nonfederal convictions and sentences for lesser offenses already included in other convictions and sentences.[194] We reiterate that none of these actions will affect appellants' maximum terms of imprisonment one whit. In all other respects, we affirm the judgments subjected to these appeals.[195]

D.C. 103, 115–116, 118, 469 F.2d 114, 126–127, 129 (1972).

181. See note 1, *supra*.

182. 139 U.S.App.D.C. 171, 432 F.2d 604 (1970).

183. For applications of *Hooper*, see, e. g., United States v. Greene, *supra* note 169, 160 U.S.App.D.C. at 34, 489 F.2d at 1158; United States v. Hill, 152 U.S.App.D.C. 213, 218, 470 F.2d 361, 366 (1972); United States v. Harrison, 149 U.S.App.D.C. 123, 126, 461 F.2d 1209, 1212 (1972).

184. United States v. Hooper, *supra* note 182, 139 U.S.App.D.C. at 173, 432 F.2d at 606.

185. *Id.*

186. *Id.*

187. 28 U.S.C. § 2106 (1970).

188. United States v. Hooper, *supra* note 182, 139 U.S.App.D.C. at 173, 432 F.2d at 604 (footnote omitted).

189. *Id.* (footnote omitted).

190. *Id.*

191. These are the convictions and sentences on counts 1, 7, 11, 15 and 16. See note 1, *supra*.

192. United States v. Hooper, *supra* note 182, 139 U.S.App.D.C. at 173 n. 8, 432 F.2d at 606 n. 8.

193. *Id.*

194. These are the convictions and sentences on counts 4, 10 and 14. See note 1, *supra*.

195. The convictions and sentences thus affirmed are those on counts 2, 5, 6, 8, 12, 17 and 18.

So ordered.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

I concur in the foregoing opinion and the judgment but disagree with the majority's assertion that the letter and note were discoverable under Rule 16(a), Fed.R.Crim.P. See Majority Op. at 1351. Such evidence, admitted and used solely in rebuttal for the purpose of impeachment, forming no part of the Government's case-in-chief, not material to the preparation of the defense and not material to the substantive crimes charged, is not a "relevant . . . statement" within the meaning of Rule 16.[1] United States v. Hodges, 480 F.2d 229 (10th Cir. 1973); United States v. Skillman, 442 F.2d 542, 550 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). See Notes of Advisory Committee on Rule 16(a)(1). The word "relevant" in the Rule is not an idle word. It means something. Relevant to what? The obvious intent is to refer to statements that were "relevant" to the offenses charged. To assert, as the majority opinion does, that the statements are "relevant" completely begs the question.

As the court in *Hodges* quoted from *Skillman*, upholding the admissibility of previously undisclosed recorded conversations of the defendant with a third person:

"[t]he recorded conversation was not a 'relevant statement' under the meaning of Rule 16. It was introduced not as a part of the government's case-in-chief, but on rebuttal. . . . It was not admitted for its truth, but was admitted solely for the purpose of [impeachment]. . . . There was nothing in the statement which had any bearing on the substantive crimes charged."

480 F.2d at 232–233.

1. *See* note 88, *supra.*

2. *See* note 93 *supra.*

1. 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

2. See note 26, *infra.*

The same interpretation of Rule 16 was applied in United States v. Garrett, 305 F.Supp. 267 (S.D.N.Y.1969):

We have long construed Rule 16(a)(1), F.R.Crim.P., "as giving defendant almost automatic right to his written or recorded statements or confessions." United States v. Federman, 41 F.R.D. 339, 341 (S.D.N.Y.1967). We adhere to the limitation expressed in *Federman* that defendant is not entitled to any tangential or "beside the point" matter he may have stated. Such irrelevant material, having no bearing at all on the crime charged, "may be put to good use in the pursuit of truth, including a test of defendant's veracity." *Id.* *Cf.* Advisory Committee's Note, Rule 16(a)(1).

305 F.Supp. at 268.

The majority opinion plays on words when it states that the letter was "tantamount to a confession of mental soundness."[2] The letter is no more a "confession" within the meaning of that term in Rule 16(a) than any other note sent to a friend.

Supplemental Opinion on Appellants' Petitions for Rehearing (D.C.Criminal Nos. 1420–71 & 1421–71).

Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge, SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Pending the Supreme Court's decision in *Mullaney v. Wilbur,*[1] we deferred action on appellants' petitions urging rehearing[2] and reversal of our holding that the District Court was constitutionally authorized to instruct the jury, in full conformity with statute,[3] that appellants bore

3. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (1970), § 207(6), D.C.Code § 24 301(j) (1973), which in relevant part provides:

No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his in-

the burden of proving by a preponderance of the evidence their insanity defenses to the nonfederal charges on trial.[4] In so concluding, we relied upon this court's decision in *United States v. Greene*[5] sustaining the operation of the statute in trials of District of Columbia Code offenses against claims of due process and equal protection violations.[6] *Mullaney* holds that Maine's requirement that one accused of murder demonstrate provocation reducing the offense to manslaughter disobeys the Fourteenth Amendment's due process command, delineated in the Court's earlier *Winship* decision,[7] that the state prove beyond a reasonable doubt every factual element of a crime underlying conviction.[8] Largely on that ground, appellants now renew their due process attack.

*Mullaney's* significance to the instant case can be appraised only in the context of our application of *Greene* as the controlling precedent. *Greene* rested on *Leland v. Oregon*,[9] wherein the Supreme Court upheld the state's allocation to the accused of the burden of proving insanity as an imposition

not treading upon "generally accepted concepts of basic standards of justice."[10] That conclusion was reached long after formulation of the *Davis* rule[11]—an exercise of the Court's supervisory authority[12]—that the Government has that burden in federal prosecutions.[13] And despite the Court's broader constitutional rulings in *Winship* five years ago[14] and in *Mullaney* within recent months[15] *Leland* has not been expressly overruled.

■ Appellants assert, however, that *Winship* and *Mullaney* have *sub silentio* set *Leland* for naught, and that in the case at bar we should so hold. In our view, we lack that prerogative. In *Greene,* the panel rejected a similar invitation,[16] this court denied rehearing *en banc*,[17] and the Supreme Court declined further review.[18] As but another panel of the court, we are not at liberty to disregard these events.[19] Moreover, while appellants' argument would have merit if its premise were acceptable, any undertaking to predict *Leland's* fate at the Supreme Court's hand would likely

---

sanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence.

4. *United States v. Caldwell*, 178 U.S.App.D.C. ——, 543 F.2d 1333 (1974), text at notes 165–172.

5. 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974).

6. *Id.* at 29–32, 489 F.2d at 1153–1156.

7. "[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970).

8. *Mullaney v. Wilbur, supra* note 1, 421 U.S. at 685–688, 95 S.Ct. at 1883–1884, 44 L.Ed.2d at 512–513.

9. 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

10. *Id.* at 799, 72 S.Ct. at 1008, 96 L.Ed. at 1309.

11. *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

12. See *id.* at 488, 16 S.Ct. at 358, 40 L.Ed. at 506; *Leland v. Oregon, supra* note 9, 343 U.S. at 797, 72 S.Ct. at 1007, 96 L.Ed. at 1308.

13. *Davis v. United States, supra* note 11, 160 U.S. at 485, 16 S.Ct. at 362, 40 L.Ed. at 505.

14. See note 7, *supra.*

15. See text *supra* at notes 7–8.

16. *United States v. Greene, supra* note 5, 160 U.S.App.D.C. at 32, 489 F.2d at 1155.

17. *Id.* at 35, 489 F.2d at 1159.

18. See note 5, *supra.*

19. This court has long adhered to the rule that a recent decision of one panel may not be overruled by another panel, but only by the court *en banc. E. g., United States v. Bryant,* 153 U.S.App.D.C. 72, 78, 471 F.2d 1040, 1046 (1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); *Insurance Agents' Int'l Union v. NLRB,* 104 U.S.App.D.C. 218, 260 F.2d 736 (1959), *aff'd,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *Mallory v. United States,* 104 U.S.App.D.C. 71, 72, 259 F.2d 801, 802 (1958); *Thompson v. Thompson,* 100 U.S. App.D.C. 285, 286, 244 F.2d 374, 375 (1957).

amount to no more than a bold but unfruitful venture in speculation. Only two weeks after granting a writ of certiorari to review *Mullaney,* the Court denied a writ in *Greene,*[20] and later refused to rehear the denial.[21] In both *Winship*[22] and *Mullaney*[23] a majority of the Court made only passing reference to *Leland.* The only positive indication emerging is the position of the two members concurring in *Mullaney* that *Leland* retains its vitality.[24]

■ In this milieu, it is not for us to declare the challenged statute unconstitutional on the theory that *Leland* is dead. Our duty is to abide *Leland* as long as the Supreme Court has not made its demise plain,[25] and that, to say the least, has not been done. Appellants, of course, are free to ask the Court for a reexamination of *Leland* and a determination as to its viability.[26]

Petitions denied.

## ORDER

Appellants' suggestions for rehearing *en banc* and supplemental memorandum in support thereof having been transmitted to the full Court and there not being a majority of the Judges in regular active service in favor of having this case reheard *en banc*, it is

Ordered by the Court *en banc* that the aforesaid suggestions for rehearing *en banc* are hereby denied.

Statement of Chief Judge BAZELON in support of his vote to grant rehearing en banc.

The question presented by this petition for rehearing en banc is the extent to which recent Supreme Court decisions in *Mullaney v. Wilbur*[1] and *In re Winship*[2] undermine the considerably earlier desicion in *Leland*

---

**20.** Certiorari was granted in *Mullaney* on October 15, 1974. 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96. Certiorari was denied in *Greene* on October 29, 1974. 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190.

**21.** 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 318 (1974).

**22.** 397 U.S. at 362, 90 S.Ct. 1068.

**23.** 421 U.S. at 1697, 95 S.Ct. at 1888 n. 21, 44 L.Ed.2d at 518 n. 21.

**24.** The court noted in *Leland* that the issue of insanity as a defense to a criminal charge was considered by the jury only after it had found that all elements of the offense, including the *mens rea* if any required by state law, had been proven beyond a reasonable doubt. . . . Although as the state court's instructions in *Leland* recognized, . . . evidence relevant to insanity as defined by state law may also be relevant to whether the required *mens rea* was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime. For this reason, Oregon's placement of the burden of proof on insanity on Leland, unlike Maine's redefinition of homicide in the instant case, did not effect an unconstitutional shift in the State's traditional burden of proof beyond a reasonable doubt of all necessary elements of the offense. . . .

*Mullaney v. Wilbur, supra* note 1, 421 U.S. at 707, 95 S.Ct. at 1893, 44 L.Ed.2d at 523–524 (concurring opinion) (citations omitted).

**25.** *Booster Lodge No. 405 v. NLRB,* 148 U.S. App.D.C. 119, 126 n. 7, 459 F.2d 1143, 1150 n. 7, *aff'd,* 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1972); *Breakfield v. District of Columbia,* 143 U.S.App.D.C. 203, 205–206, 442 F.2d 1227, 1229–1230 (1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 871, 27 L.Ed.2d 807 (1971); *Salerno v. American League of Professional Baseball Clubs,* 429 F.2d 1003, 1005 (2d Cir. 1970); *Sears v. Hassett,* 111 F.2d 961, 964–965 (1st Cir. 1940); *Northern Virginia Regional Park Authority v. United States Civil Service Comm'n,* 437 F.2d 1346, 1350–1351 (4th Cir.), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717 (1971); *Blalock v. United States,* 247 F.2d 615 (4th Cir. 1957); *Lichter Foundation, Inc. v. Welch,* 269 F.2d 142, 145 (6th Cir. 1959); *United States v. Chase,* 281 F.2d 225, 230 (7th Cir. 1960).

**26.** Appellants' petitions urge additional grounds for rehearing. As to them we adhere to our earlier opinion as editorially revised.

**1.** 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

**2.** 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

*v. Oregon.*[3] In *United States v. Greene*[4] a division of this Court offered two reasons for continuing to view *Leland* as authoritative after *Winship.* Neither reason can survive *Mullaney.*

First, the *Greene* division interpreted *Winship* to require the prosecution to bear the burden of persuasion only with respect to "proof of facts—'the occurrence of an event'" and not with respect to "mental condition."[5] But in *Mullaney* the "occurrence of an event" was not in dispute; what was at issue was the defendant's mental state at the time of the event. Moreover, the defendant's state of mind was relevant in *Mullaney*—as it is in the insanity context—because it determined the extent of defendant's blameworthiness.[6] Hence, *Greene's* dichotomy between "proof of facts" and "mental condition" falls. Similarly, *Greene's* contention that sanity cannot be an "essential element" of a crime unless the prosecution is required to produce evidence as to sanity in its case-in-chief[7] also falls. *Mullaney* expressly permits States to place the burden of going forward in producing evidence with respect to malice on defendants even though it prohibits the States from placing the burden of persuasion on the defense.[8] *Mulla-*

ney reaffirms the Supreme Court's conclusion in *Davis v. United States*[9] that sanity is a "fact essential to constitute the crime" even though the burden of going forward with evidence is placed on the defense.

*Mullaney* is also significant for its strikingly narrow description of the current status of *Leland*: "In *Leland* . . . the Court declined to apply the specific holding of *Davis*—that the prosecution must prove sanity beyond a reasonable doubt—to the States."[10] This is the only time *Leland* is cited. Nowhere does the Court reaffirm *Leland* or suggest that it is something other than an anachronism. In contrast *Davis* is relied on substantially in *Mullaney,*[11] just as it was in *Winship.*[12]

Most importantly, all of the considerations that underlie *Mullaney*—and *Winship*—compel the conclusion that the prosecution must bear the burden of persuasion with respect to insanity. Plainly stated the basic thrust of the two cases is simply that erroneous determinations of guilt or of the degree of culpability are intolerable.[13] If due process requires proof beyond a reasonable doubt of elements relating to the degree of culpability, *a fortiori* due process must require proof beyond a reasonable doubt of sanity, which determines culpability *vel non.*[14]

---

**3.** 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

**4.** 489 F.2d 1145 (1974), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974).

**5.** *Id.* at 1155, *quoting United States v. Brown,* 155 U.S.App.D.C. 402, 478 F.2d 606, 609 (1973). I remain convinced that sanity has always been a "factual question" and that the division misconstrued *Brown. See United States v. Greene, supra* note 4, at 1175 (Bazelon, C. J.).

**6.** 95 S.Ct. at 1889.

**7.** *See* 489 F.2d at 1155, 1156.

**8.** 95 S.Ct. at 1891 n. 28. *See also id.* at 1888 n. 20, 1891–92 n. 31. The *Mullaney* Court even indicated that the allocation of the burden of producing evidence can raise a substantial constitutional question. *Id.* at 1891–92 n. 31.

**9.** 160 U.S. 469, 485–86, 16 S.Ct. 353, 357, 40 L.Ed. 499 (1895).

**10.** 95 S.Ct. at 1888 n. 21. The cite to *Leland* appears in the section of the Court's opinion placing the issue "in historical context." *Id.* at 1886.

**11.** *Id.* at 1888, 1891–92 n. 31.

**12.** *See* 397 U.S. at 362–63, 90 S.Ct. at 1072, 25 L.Ed.2d at 374. *Leland* was cited only once in *Winship,* and then only to support the proposition that "it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required." *Id.* at 362, 90 S.Ct. at 1071. *See also United States v. Greene, supra* note 4, at 1175–76 (Bazelon, C. J.).

**13.** *See* 95 S.Ct. at 1890, *quoting* 397 U.S. at 363, 364, 90 S.Ct. 1068.

**14.** We have recently reaffirmed that the insanity defense embodies the "core concept" that criminal responsibility not be assessed when the defendant's acts were not the result of a free choice to do wrong. *United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969, 985 (1972).

It would appear that the court has denied rehearing in this case because the Supreme Court has not yet expressly stated that *Leland v. Oregon* is overruled. Of course we must proceed with extreme caution in deciding whether the Supreme Court has fatally undermined one of its own precedents. But we could hardly say that *Plessy v. Ferguson*[15] is, or an economic due process decision of the *Lochner v. New York*[16] era would be, binding because not expressly overruled.[17] Judge Learned Hand, in discussing an appeals court's role when confronted with a Supreme Court precedent not yet overruled, said: "the measure of [the court's] duty is to divine, as best it can, what would be the event of an appeal in the case before it."[18] In the same case Judge Clark wrote: "We must determine with the best exercise of our mental powers . . that law which in all probability will be applied to these litigants or others similarly situated."[19] In this sense *any* decision in

this case—or any other case—involves a "venture in speculation." The real question is whether we should make our prediction solely dependent on the Supreme Court's failure to expressly overrule *Leland*. To do so would "stultify ourselves and unnecessarily burden the Supreme Court."[20] Especially with the liberty of individuals at stake[21]:

> We would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has . . . impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties.

The court today concedes—and the case it cites admit—that *Leland* need not be followed if its demise is plain.[22] The court makes no effort to explain, however, what force *Leland* retains. Nor can clues be derived from the denial of certiorari in *Greene*,[23] the citation of *Leland* once in both

**15.** 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

**16.** 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

**17.** *Cf. Fleming v. South Carolina Elec. & Gas Co.*, 224 F.2d 752 (4th Cir. 1955); *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

**18.** *Spector Motor Service Inc. v. Walsh*, 139 F.2d 809, 823 (2d Cir.) (dissenting opinion), *rev'd*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

**19.** *Id.* at 814.

**20.** *Perkins v. Endicott Johnson Corp.*, 128 F.2d 208, 217–18 (2d Cir. 1942) (Frank, J.), *aff'd*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943).

**21.** *Barnette v. West Va. State Bd. of Educ.*, 47 F.Supp. 251, 252–53 (S.D.W.Va.1942) (Parker, C. J.), *aff'd*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). *See also, e. g., Mason v. United States*, 461 F.2d 1364, 1374–75, 198 Ct.Cl. 599 (1972), *rev'd on other grounds*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Martin v. Virginia*, 349 F.2d 781, 783–84 (4th Cir. 1965) (Sobeloff, J.); *Smith v. Smith*, 391 F.Supp. 443, 446 (W.D.Va.1975); *Healy v. Edwards*, 363 F.Supp. 1110, 1117 (E.D.La.1973), *vacated*, 421 U.S. 772, 95 S.Ct. 2410, 44 L.Ed.2d 571 (1975); *Fishkin v. United States Civil Service Comm'n*, 309 F.Supp. 40, 44–45 (N.D.Cal.

1969), *appeal dismissed*, 396 U.S. 278, 90 S.Ct. 557, 24 L.Ed.2d 463 (1970); *Gold v. DiCarlo*, 235 F.Supp. 817, 819–20 (S.D.N.Y.), *aff'd*, 380 U.S. 520, 85 S.Ct. 1332, 14 L.Ed.2d 266 (1955); *Browder v. Gayle*, 142 F.Supp. 707, 716–17 (M.D.Ala.1956), *aff'd mem.* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956). *See generally*, Kelman, *The Force of Precedent in the Lower Courts*, 14 Wayne L.Rev. 3 (1967).

In *Rowe v. Peyton*, 383 F.2d 709, 714 (4th Cir. 1967) (Haynsworth, C. J.), the Fourth Circuit concluded that "the Supreme Court today would not follow" a particular precedent that had adopted a "doctrinaire approach" that had been "thoroughly rejected by the Supreme Court in recent cases." In affirming the judgment the Supreme Court quoted this language from Chief Judge Haynsworth's opinion and said: "We are in complete agreement with this conclusion and the considerations underlying it." *Peyton v. Rowe*, 391 U.S. 54, 57–58, 88 S.Ct. 1549, 1551, 20 L.Ed.2d 420 (1968).

**22.** *See* 178 U.S.App.D.C. p. —— & n. 25, 543 F.2d p. 1370 & n. 25 *supra.*

**23.** It is well-established that denials of certiorari do not reflect judgments on the merits. *See, e. g., Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (Frankfurter, J.); *House v. Mayo*, 324 U.S. 42, 48, 65 S.Ct. 517, 89 L.Ed. 739 (1945); *United States v. Carver*, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923); *Hamilton Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 257–59, 36 S.Ct. 269, 60 L.Ed. 629 (1916).

*Mullaney* and *Winship*[24] or the view of two concurring Justices in *Mullaney* that *Leland* is still authoritative.[25] The question presented is of the greatest general importance. For the sake of these appellants and the many others who will languish in jail awaiting a Supreme Court determination one or two years hence, we have a clear duty to grant the hearing requested and to explain specifically the extent, if any, of *Leland's* vitality.

---

**24.** Especially is this true where the cites to *Leland* were so reserved. See text at notes 10–12, *supra.*

**25.** 95 S.Ct. at 1893 (Rehnquist, J., joined by Burger, C. J., concurring). The majority in

*Mullaney* made no reference to the argument of the concurring Justices.

